Michael Lee **FULTZ, Appellant-Defendant,**

v.

**STATE of Indiana, Appellee-Plaintiff.**

No. 53A01-0410-CR-456.

Court of Appeals of Indiana.

May 26, 2006.

Publication Ordered June 19, 2006.

**618**

Eric K. Koselke, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Maureen Ann Bartolo, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

**OPINION**

FRIEDLANDER, Judge.

Michael Lee Fultz appeals his convictions for Arson,[1] as a class B felony, and Murder,[2] a felony. He also challenges the enhanced sentence imposed for each conviction, as well as the enhancement for being a habitual offender. He presents the following restated issues for review:

1. Was Fultz denied his right to an early trial?
2. Did the State present sufficient evidence to support the murder conviction?
3. Was Fultz properly sentenced?

We affirm.

The facts most favorable to the verdict reveal that in the months preceding April 2003 Fultz was an inmate of the Monroe County Jail serving a sentence for a misdemeanor conviction. Teresa Farrell, a correctional officer at the jail, became friendly with Fultz, and they began dating upon his release. Their relationship was kept fairly secret because Farrell was concerned about losing her job.

About a month later, on the evening of April 7, 2003, Fultz and Farrell went to a bowling alley to drink and play pool. They met up with Fultz's friends, Aimee Taylor and Brian Workman. The two couples left the bowling alley around 3:00 a.m. and went to Fultz's basement bedroom at his parents' home to continue drinking beer and socializing. There, Fultz gave Workman and Taylor tattoos, as Farrell took

---

1. Ind.Code Ann. § 35–43–1–1(a) (West 2004).

2. Ind.Code Ann. § 35–42–1–1 (West 2004).

pictures. At some point, Farrell took an anxiety pill (Xanax) and also gave one to Taylor. Taylor and Workman left the residence around 6:45 a.m. on April 8. Although they had all been drinking, Taylor described Farrell and Fultz as "fine" and not "falling down" drunk. *Transcript* at 421.

Within the next couple hours, Fultz woke his brother Steve and asked him to come down to his bedroom where Steve observed Farrell laying on the bed. In Steve's opinion, Farrell was dead because she was not breathing and had vomit in and near her mouth. He attempted CPR to no avail. Fultz then directed Steve to get a gas can. Steve drove to a nearby gas station and filled a gas can while Fultz gathered Farrell's belongings. Fultz put on a pair of plastic gloves and placed Farrell's boots on her feet and carried her out to her vehicle. He placed her in the front passenger seat, which he reclined all the way back, and put the gas can on the seat between her legs.

Fultz drove Farrell's vehicle and told Steve to follow in another vehicle. They took back roads out of the neighborhood. Fultz became nervous when they passed an Ellettsville police officer driving the other direction, but the police vehicle did not turn around. Fultz first stopped at an old stone quarry. When Fultz exited, another vehicle started coming down the drive and Steve honked his horn to warn Fultz. Fultz reentered Farrell's vehicle and headed towards Moon Road. Fultz eventually drove off of Moon Road toward a train trestle on property owned by Lowell Caudill, as Steve waited along Moon Road.

Around 9:30 a.m., Fultz proceeded to pour two and one-half gallons of gasoline inside Farrell's vehicle and around her body. He then lit a cigarette and set the car on fire. At about the same time, Caudill drove past Steve and became suspicious. Caudill turned his vehicle around and, as he approached, he saw Fultz running with a gas can away from the burning vehicle. Fultz jumped into Steve's vehicle and Steve sped away as Caudill unsuccessfully gave chase. As they fled, Fultz discarded the gas can and some of Farrell's personal belongings, including her camera and its film that Fultz exposed. Steve drove Fultz to their aunt's home where Fultz shaved his head and trimmed his singed eyebrows and facial hair. In the meantime, Steve returned to Fultz's bedroom to clean the sheets and mattress because he "just knowd not to leave nothing behind." *Id.* at 351.

Because of the accelerant used by Fultz, the fire burned "extremely hot and extremely quick". *Id.* at 309. Farrell's body was burned beyond recognition. A great deal of tissue was burned away and her skull was exposed. Her boots had melted into the floorboard and her muscle and tissue were burned onto the metal of the seat. Removing her body in one piece was a tedious task. Although the coroner's team was able to successfully remove the body, Farrell's skull disintegrated during transport. Farrell's body was positively identified through dental records. The autopsy of Farrell's body revealed that she was dead before the fire. The cause of death, however, could not be determined during the autopsy.

The investigation quickly led police to Fultz and Steve, and the brothers were separately interviewed on April 9. They both lied to police. Thereafter, on April 15, the State filed a probable cause affidavit against Fultz. The State sought to establish probable cause that Fultz murdered Farrell and that he committed arson resulting in either bodily injury or serious bodily injury to Farrell, a class A felony. Following a probable cause hearing, how-

ever, the court found probable cause to arrest Fultz only on the charge of arson resulting in property damage of at least $5000, a class B felony. Accordingly, on April 16, the State charged Fultz by information with class B felony arson. On that same day, Fultz moved for an early trial pursuant to Ind. Criminal Rule 4(B), and the trial court set the matter for trial by jury on June 24, 2003.

Prior to trial, the State became aware of a confidential informant, later identified as Antonio Jackson, who was an inmate at the Wabash Valley Correctional Facility where Fultz was being held pending trial. Investigators interviewed Jackson on June 13, 2003 regarding a conversation Jackson had with Fultz in May. According to Jackson, Fultz reported that he had been partying with Farrell and that Farrell had taken some pictures of him. Fultz explained that he became worried about what she was going to do with the photographs, and he "choked her out". *Appellant's Appendix* at 30. He then woke his brother Steve to assist. Fultz described putting Farrell into her vehicle and placing a gas can on her lap. According to Jackson, Fultz further explained that he passed a police vehicle along the way and that he became afraid but then laughed when the police vehicle did not turn around and follow him. Fultz then admitted to Jackson that he set Farrell's car on fire. Certain of these details (i.e., the placement of the gas can and the pictures taken by Farrell) had not been made known to the public and were independently corroborated by the police investigation.

In light of this new evidence, coupled with evidence the police had formerly gathered, the State sought dismissal of the arson charge on June 18, and charged Fultz with murder under a new cause number the following day. Fultz objected, arguing that the State was abusing its prosecutorial authority and attempting to alter his early trial rights. At a hearing on June 20, the State argued that the arson and murder charges were based upon separate acts and, therefore, Fultz's early trial rights in the arson case did not attach to the murder charge. In the alternative, the State requested a continuance under Crim. R. 4(D), noting that it had recently contacted an expert in burned bodies and that the report would not be procured in time for trial. At the conclusion of the hearing, the trial court ruled that the time limit for trying the case continued to run but that the State was entitled to a ninety-day continuance.[3]

On September 3, 2003, the State filed an amended information adding the charge of arson, as a class B felony, and alleging that Fultz was a habitual offender. The State also requested a life without parole enhancement. Over Fultz's objection, the trial court allowed the amendments.

After additional continuances requested by Fultz, the jury trial commenced in April 2004. On April 14, 2004, the jury found Fultz guilty of arson and murder but recommended a fixed term sentence rather than life without parole. Thereafter, Fultz admitted to being a habitual offender. On August 4, 2004, the trial court sentenced Fultz to consecutive, maximum terms of twenty years for arson and sixty-five years

---

3. The court explained in part:
   I think that its [sic] fair to say that both parties deserve their rights, as they are protected under criminal rule 4 granted to them. That being the case, even though I would be inclined to say that the time limit

for trying this case continues to run, I do believe that justice and the balancing of the rights indicates that the Court should grant the State a 90 day extension of time in which to present this case at trial.
*Transcript* at 58.

for murder. The court further enhanced Fultz's sentence for arson by twenty-five years for being a habitual offender.[4] Fultz now appeals. Additional facts will be presented as necessary.

1.

■ Fultz initially argues that his right to an early trial, as set forth in Crim. R. 4(B),[5] was violated. In particular, he claims that in dismissing the original arson charge seven days before trial and then filing the murder charge "the State was acting in bad faith to avoid the early trial deadlines." *Appellant's Brief* at 9–10.

■ Fultz directs us to one case in support of his argument. He cites *Davenport v. State*, 689 N.E.2d 1226 (Ind.1997), *aff'd on reh'g*, 696 N.E.2d 870 (1998), for the proposition that although the State has significant latitude in filing a second information, "the State cannot go so far as to abuse its power and prejudice a defendant's substantial rights." *Id.* at 1230. While we do not dispute this general proposition, we observe that Fultz has failed to establish an abuse of power or prejudice to his substantial rights. Here, unlike in *Davenport*, the State had not received an adverse ruling in the original cause that it was trying to avoid. *See id.* at 1230 ("the State received an adverse ruling in the original trial court on its motion to amend the information. . . . Because of a sleight of

hand, the State was able to escape the ruling of the original court and pursue the case on the charges the State had sought to add belatedly").

Moreover, contrary to Fultz's assertions, it is evident the State did not file the murder charge in an attempt to thwart his right to an early trial. Rather, the State filed the murder charge as the result of newly discovered evidence that was previously unavailable to the State. As set forth above, the State had originally sought to charge Fultz with murder but, according to the trial court, did not have enough evidence to establish probable cause. When additional evidence came to light, the State promptly moved forward with the murder charge. We find nothing suspect in this course of action.

■ Although the State argued that the early trial deadline did not extend to the murder charge, the trial court disagreed and determined that the time limit for trying the case continued to run. Thus, the trial court ensured that Fultz's right to an early trial was preserved. In light of the new evidence and the State's inability to obtain evidence from an expert in burned bodies by the early trial date, however, the trial court granted the State a ninety-day continuance pursuant to Crim. R. 4(D). *See Smith v. State*, 802 N.E.2d 948, 951–52 (Ind.Ct.App.2004) (the rule

---

**4.** The trial court's sentencing statement is somewhat ambiguous with regard to whether the habitual offender status was applied to the murder or the arson conviction. We deduce, however, that the enhancement applies to the arson conviction because the parties and the trial court all proceeded under the assumption that Fultz could receive less than thirty years on the habitual offender enhancement. This could only be true if the habitual offender status was applied to the arson conviction, because a habitual offender enhancement for a murder conviction is always thirty years. *See* Ind.Code Ann. § 35–50–2–8(h) (West, Premise through 2005 1st Regular Sess.); I.C.

§ 35–50–2–3(a) (West, Premise through 2005 1st Regular Sess.). On the other hand, the range for an enhancement of the arson conviction was ten to thirty years. *See* I.C. § 35–50–2–8(h); I.C. § 35–50–2–5 (West, Premise through 2005 1st Regular Sess.).

**5.** The rule provides in relevant part: "If any defendant held in jail on an indictment or an affidavit shall move for an early trial, he shall be discharged if not brought to trial within seventy (70) calendar days from the date of such motion". Crim. R. 4(B)(1).

provides for a ninety-day extension "if the court is satisfied there is State's evidence that cannot be had on the timely trial date but that will be available within ninety days"). Fultz does not argue on appeal that the trial court abused its discretion in granting the extension, and we find no abuse of discretion.

Fultz further asserts that the later amendment of the information to include the original count of arson evidences the State's bad faith. We cannot agree. The refiling of the arson charge was in accord with the trial court's ruling, on June 20, 2003, that Fultz's early trial rights continued under the new cause number and were initiated by the original arson charge.[6] Therefore, the State did not act in bad faith or abuse its power by relying on the trial court's ruling.

### 2.

Fultz contends that the State presented insufficient evidence to support the murder conviction. In particular, he directs us to conflicting evidence regarding the cause of Farrell's death.

Our standard of review for claims challenging the sufficiency of the evidence is well settled. We will not reweigh the evidence or judge the credibility of the witnesses, and we will respect the jury's exclusive province to weigh conflicting evidence. *McHenry v. State*, 820 N.E.2d 124 (Ind.2005). Considering only the evidence and the reasonable inferences supporting the verdict, our task is to decide whether there is substantial evidence of probative value from which a reasonable jury could find the defendant guilty beyond a reasonable doubt. *Id.* Further,

> [a] conviction for Murder may be based purely on circumstantial evidence. We will not disturb a verdict if the jury could reasonably infer that the defendant is guilty beyond a reasonable doubt from the circumstantial evidence presented. On appeal, the circumstantial evidence need not overcome every reasonable hypothesis of innocence. It is enough if an inference reasonably tending to support the verdict can be drawn from the circumstantial evidence.

*Moore v. State*, 652 N.E.2d 53, 55 (Ind. 1995).

Fultz testified in his own defense at trial. According to Fultz, he fell asleep after Workman and Taylor left his home on the morning in question and he woke up soon thereafter to find Farrell not breathing and with vomit coming out of her mouth. Fultz allegedly believed she had overdosed. Afraid that he would be blamed for her death, Fultz testified that he and his brother gathered Farrell's belongings, filled a container with gasoline, and loaded Farrell's lifeless body into her vehicle.[7] He further testified that he drove her vehicle to the location off of Moon Road, passing a police vehicle on the way, and poured two and one-half gallons of gasoline inside the vehicle and around her body while Steve waited in another vehicle. After dousing the vehicle, Fultz testified he suddenly had second thoughts and decided to leave without setting the car and Farrell on fire. So, how did the fire start? Fultz explained:

---

**6.** Implicit in the court's ruling was that the State did not need to dismiss the arson charge when it filed the murder charge because the same early trial deadline applied regardless of whether the arson charge was dismissed.

**7.** Steve testified for the State, under a grant of use immunity, and provided a similar account of the events following Farrell's death. He testified, however, that he never asked or discussed with Fultz what happened to Farrell. Steve further testified that he did not see how the fire started.

I went ahead and used the bathroom, real quick, I'd been holding it ever since when I woke up and had to use the bathroom real bad from drinking, so, I had to go real bad, so I went ahead and used the bathroom, I zipped up, and it was just, a normal movement, I put a cigarette in my mouth and I lit it and when I did, it was like this gust of hot air, just shot out and hit me in the face. And there was flames followed behind it, and I kinda of jumped back and it startled me and it just caught me off guard, I wasn't prepared for it.

*Transcript* at 580.

It was entirely within the jury's province to disregard Fultz's self-serving testimony regarding the cause of Farrell's death, especially in light of the extreme measures he took after her death. Further, the State presented evidence to contradict the assertion that Farrell died as a result of excessive alcohol and drug use. Taylor, who was with Farrell shortly before her death, testified that Farrell did not appear particularly intoxicated. Dr. John Pless, one of the pathologists who performed the autopsy on Farrell, specifically testified that the quantity of substances in her body was not sufficient to cause her death.[8]

At trial, Dr. Pless opined that Farrell died from a blunt force injury to the head. His opinion was based on photographs taken of Farrell's charred remains at the burn site, before the body was extracted from the vehicle and when Farrell's skull was still intact. In the photographs, which he did not have access to at the time of the autopsy, Dr. Pless observed "a very distinctive fracturing of the skull" that he did not believe to be a feature of fire. *Id.* at 438. While he could not say to a reasonable degree of medical certainty that blunt force injury caused her death, Dr. Pless testified that in his opinion it was "very probable". *Id* at 457. He further explained that unconsciousness and vomiting are common consequences of a head injury.

The State also presented testimony from three of Fultz's fellow inmates (Jackson, James Hatton, and Robert Mays), who testified regarding conversations each of them had individually with Fultz. Although the details provided by these witnesses varied to some degree, much of their testimony was similar, and each indicated that Fultz said he choked Farrell. The witnesses recounted specific details that had been independently corroborated during the investigation, such as the placement of the gas can between Farrell's legs,[9] the fact that Fultz passed a police vehicle while driving Farrell's vehicle, and the photographs taken by Farrell.

With respect to the testimony of these three inmates, Fultz asserts:

The State presented inherently incredible testimony of three prisoners with lengthy criminal histories. However, their testimony as to cause of death was contradicted by the autopsy findings as Dr. Pless did not indicate there was any evidence of strangulation and found that

---

**8.** The autopsy revealed Farrell had a blood alcohol level of .106. Several therapeutic drugs (Tylenol, Allegra, and Xanax) were also found in her system, along with metabolites of cocaine.

**9.** Hatton and Jackson both reported that Fultz laughed when he described the placement of the gas can. Jackson explained this was one of the reasons he felt compelled to report his conversation with Fultz: "I got the weirdest feeling when he laughed about passing a police officer with this woman sitting next to him with a gas can in her lap, that's what done it." *Id.* at 520. Regarding the placement of the gas can, Mays similarly reported that Fultz told him, "you know what's funny is that she never even knew that she was carrying her own death." *Id.* at 475.

Ms. Farrell was alive when the fire was started.

*Appellant's Brief* at 14 (citations omitted). On the contrary, the evidence clearly establishes Farrell was dead when the fire started. Moreover, while the autopsy did not reveal evidence of strangulation, Dr. Pless explained that all of the tissue that would have assisted in making a diagnosis of manual strangulation "was essentially gone, due to the effects of the fire." Transcript at 467. Therefore, while the autopsy findings did not verify Farrell was strangled, that does not mean that the findings contradicted the testimony of Jackson, Mays, and Hatton. The jury was fully apprised of these witnesses' criminal histories, and we reject Fultz's invitation to reweigh the evidence and judge witness credibility.

Although there was conflicting evidence presented on the cause of death, the State presented ample evidence that Fultz knowingly killed Farrell. The fact that Fultz prevented a precise determination of the cause of death by intentionally burning Farrell's dead body does not mean that the evidence was insufficient. In short, the evidence and reasonable inferences favorable to the verdict reveal that Fultz violently killed Farrell and then, with his brother, set out to destroy or dispose of any evidence of his involvement in Farrell's death.

3.

Finally, Fultz challenges his sentence. In sentencing Fultz, the trial court found two aggravating circumstances: 1) Fultz's extensive criminal history, including three offenses as a juvenile that were waived to adult court and resulted in felony convictions and other felony convictions that involved acts of interpersonal violence; and 2) the fact that he was on parole at the time of the instant offenses. Finding no significant mitigating circumstances, the trial court sentenced Fultz to maximum sentences of twenty years for arson and sixty-five years for murder. In light of Fultz's admission of his habitual offender status, the court imposed a twenty-five-year enhancement rather than the maximum permitted enhancement of thirty years.

Fultz does not challenge the aggravating circumstances found by the trial court. Rather, he asserts the court failed to consider significant mitigating circumstances, including his mental health and his admission to the habitual offender allegation. Further, in light of these alleged mitigating circumstances and the jury's recommendation against a sentence of life without parole, Fultz argues his aggregate sentence of 110 years is inappropriate.

■■■ Although a trial court must consider all evidence of mitigating circumstances presented by a defendant, the finding of mitigating circumstances rests within the sound discretion of the court. *Newsome v. State*, 797 N.E.2d 293 (Ind.Ct. App.2003), *trans. denied.* "The trial court need not consider, and we will not remand for reconsideration of, alleged mitigating factors that are highly disputable in nature, weight, or significance." *Id.* at 301. The trial court is not obligated to explain why it did not find a factor to be significantly mitigating and is under no obligation to find mitigating factors at all. *Newsome v. State*, 797 N.E.2d 293.

■■ With regard to mental health, Fultz argues the trial court failed to consider as mitigating his bi-polar disorder, his bouts of depression, his admissions to psychiatric hospitals, and his drug and alcohol use described as self-medicating. The significance of Fultz's mental health issues was disputed below. While Fultz presented expert testimony on this matter from Dr. Michael Jenuine, Dr. Jenuine admitted on cross-examination that much

of his evaluation was based on Fultz's self-reporting. Prior to sentencing, Fultz was also examined by the Indiana Reception Diagnostic Center (RDC). The written RDC psychological evaluation noted significant discrepancies in the information provided by Fultz and, specifically, did not diagnose him as bi-polar. In summary, the RDC evaluation provided: "Offender appears to be in relatively little distress and does not appear to be in need of psychological services. His suicidal ideation does not appear to be genuine.... He appears to [be] exaggerating current complaints." *Appellant's Appendix* at 169. Based upon the conflicting evidence, we cannot conclude that the trial court abused its discretion by failing to finding Fultz's mental health to be a significant mitigating circumstance.

Fultz's claim that the trial court failed to take into consideration his admission to being a habitual offender is without merit. It is undisputed that the court informed Fultz it would consider an admission at sentencing and that this promise influenced Fultz to admit the habitual offender allegations. Both parties addressed this promise at the sentencing hearing. It is evident that in determining the appropriate enhancement for being a habitual offender, the trial court took into consideration Fultz's admission, as he received less than the maximum allowable enhancement. Therefore, we find no error.

■ Finally, we address Fultz's claim that his 110–year aggregate sentence is inappropriate. He relies on our constitutional authority to revise a sentence if, after consideration of the trial court's decision, we conclude the sentence is inappropriate in light of the nature of the offense and character of the offender. Ind. Appellate Rule 7(B); *Gornick v. State*, 832

N.E.2d 1031 (Ind.Ct.App.2005), *trans. denied.*

In Fultz's relatively short life,[10] he has amassed an extensive criminal history and has demonstrated that he is unwilling to conform his conduct to the dictates of the law. In fact, Fultz was on probation and had been released from incarceration only one month before he killed Farrell. Fultz testified that he had an intimate relationship with Farrell and that his life was going to change for the better because of her. Despite this relationship, Fultz violently murdered the woman he claimed to love. After enlisting the help of his brother, Fultz then quickly devised a cold, calculated plan to hide the truth. That is, he put gloves on his hands, gathered Farrell's belongings, placed her boots on her feet, carried her body to her vehicle, used a gas can to prop her up in the passenger seat, drove to a remote location, poured gasoline inside the vehicle, and then set the vehicle and Farrell on fire. When recounting the details to fellow inmates, Fultz even callously laughed about the placement of the gas can between her legs.

The nature of the crimes and Fultz's poor character support a lengthy and enhanced sentence. We are not persuaded by his argument that the lengthy fixed term imposed by the trial court was inappropriate because the jury recommended against a sentence of life without parole. Fultz's sentence is not inappropriate.

Judgment affirmed.

SULLIVAN, J., and VAIDIK, J., concur.

## ORDER

On May 26, 2006, the Court handed down its opinion in this appeal marked Memorandum Decision Not for Publica-

---

**10.** Fultz was twenty-six when he committed the instant crimes.

tion. The Appellee, by counsel, has filed a Verified Motion for Publication. The Appellee states that this Court's decision addressed an issue that will become more frequent wish the continuing advance of forensic sciences, to-wit, the adding of charges when new evidence finally establishes probable cause that an already-charged defendant committed an additional offense. Therefore, appellee requests publication of this case pursuant to appellate Rule 65(B).

Having considered the matter, the Court FINDS AND ORDERS AS FOLLOWS:

1. The Appellee's Verified Motion for Publication is GRANTED and this Court's opinion handed down in this cause on May 26, 2006, marked Memorandum Decision, Not for Publication is now ORDERED PUBLISHED.

FRIEDLANDER, SULLIVAN, and VAIDIK, JJ., concur.