**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**MARK S. LENYO**
South Bend, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**LARRY D. ALLEN**
Deputy Attorney General
Indianapolis, Indiana

FILED

Dec 10 2013, 9:39 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DABIAN DORION BOYD, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 71A04-1304-CR-174 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE ST. JOSEPH SUPERIOR COURT
The Honorable J. Jerome Frese, Judge
Cause No. 71D03-1207-MR-9

**December 10, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

Dabian Dorion Boyd ("Boyd") appeals from his convictions after a jury trial of two counts of murder[1] contending that the evidence is insufficient to sustain his convictions. Finding that there is sufficient evidence in the record to support his convictions, we affirm.

## FACTS AND PROCEDURAL HISTORY

The facts most favorable to the jury's verdict reveal that on May 5, 2012, Gardenia Newman ("Newman") finished working at St. Joseph Hospital at 11:30 p.m. and drove to meet a friend who had planned to be barbecuing at the local Elk's Lodge. Newman did not find her friend there and proceeded to drive toward her home when she observed a man staggering around Napier Street. The man, who was later identified as Kalyn Farmer ("Farmer"), staggered toward Newman's car and told her that he had been shot. Newman directed the man to get into her car. Newman rushed Farmer to Memorial Hospital ("Memorial") in South Bend. Although Farmer was seriously wounded, he attempted to provide Newman with directions to the hospital, but he said nothing to her about the identity of the person who had shot him or about the events leading up to the shooting.

Hospital surveillance tape showed that Newman and Farmer arrived at Memorial at 12:31 a.m. where they were met by Kevin Slaughter ("Slaughter"), a hospital security guard. Newman told Slaughter that the man, who Slaughter later learned was Farmer, had been shot and asked if she needed to stay. Slaughter told Newman that she could go and placed Farmer into a wheelchair. Slaughter took Farmer to the Emergency Treatment Center for care. En route to the Emergency Treatment Center, Farmer asked for help, but

---

[1] *See* Ind. Code § 35-42-1-1.

did not disclose to Slaughter any details about the shooting.

Farmer died that night as a result of his injuries. Farmer had been shot three times in the back with one bullet entering his lower back to the right and lodging into his spine, another traversing through his upper right arm and through his right forearm, and the third entering in the lower right portion of the back, and travelling through the abdominal cavity, liver, and right lung. A bullet was recovered from Farmer's right chest muscles. The official cause of Farmer's death was multiple gunshot wounds.

That same night, Mercedes Newbill ("Newbill") called a close friend he referred to as his cousin, Michele Brown ("Brown"), and asked for her to come pick him up. After some miscommunication, they met at Brown's house and arranged for Newbill to borrow Brown's car. Brown drove a dark blue 2005 Dodge Stratus she had obtained in February 2012. Brown regularly allowed Newbill, and a female friend who stayed with Brown, to drive her car. Newbill paid Brown for the use of her car several times a week.

The two people who accompanied Newbill to Brown's house that night were Farmer and a male who was known as Diamond. Diamond stated that he had to go to work, and left in his own vehicle, a goldish-colored mini-truck. Newbill went to a black Chevy Tahoe that was parked down the street and spoke with an unknown person inside. The unknown person exited the Tahoe and walked with Newbill back to the Brown's car. The unknown person left and came back quickly, and then got out of the car for good. Newbill left with Farmer in Brown's car at approximately 8:30 p.m. Brown never saw Newbill alive again, nor did she see her car after Newbill left in it.

Also on that night, Cheryl Holt ("Holt"), Boyd's cousin, and also Newbill's cousin,

3

was at her grandmother's restaurant from 10 p.m. until 11 p.m. At around 11 p.m., Newbill came into the restaurant alone, and left just a few minutes later. Holt left the restaurant with her mother at about 11:15 p.m., driving first to a party Holt's uncle was throwing on Cherry Street, which was a couple of blocks from Holt's grandmother's house. Holt and her mother arrived there just before midnight, but did not go inside, instead staying in the parking lot to talk with Holt's uncle. After approximately ten minutes, Holt and her mother drove to Holt's grandmother's house down the street. Holt sat on the porch with another one of her cousins, D'Angelo Boyd Newbill, and his girlfriend.

While the three were sitting on the porch, Boyd, who was alone, walked up from the opposite direction of their uncle's party. After arriving at his grandmother's house, Boyd said to those sitting on the porch, "Did y'all see all these police out here? You know I got a warrant. I got to get away from here." *Tr.* at 332. Boyd then went inside the house. Although the three had not seen police officers patrolling the area prior to Boyd's arrival, police officers showed up in the neighborhood just after Boyd arrived at the house.

A short time later, Holt's grandmother asked her to pick up Boyd from their uncle's party. Holt did as her grandmother asked and brought Boyd back to their grandmother's house, where they stayed for approximately twenty minutes. Boyd gave Holt some gas money and asked her to take him to another cousin's house on the south side of town. Holt did as Boyd asked and did not see him for the rest of the evening.

After Farmer was taken to the hospital, the South Bend Police Department received a call alerting them that there had been a shooting. Although police and the homicide unit were alerted, they were unable to locate the scene of the shooting that night. The next

4

morning, Officer Ken Ryan ("Officer Ryan"), began his shift at 6 a.m., and had been briefed about the shooting, which had occurred in his patrol area. Officer Ryan went to the County Metro Homicide Unit and Memorial to find out more information. After starting with the initial area and then expanding his search outward, Officer Ryan noticed an unusual looking dark blue Dodge Stratus that had been backed into the trees off of an alley.

Officer Ryan parked down the street and approached the vehicle on foot in order to avoid tainting any evidence in the event that the location was the scene of the shooting. As Officer Ryan drew nearer, he noticed that the driver's side window was shattered and had a bullet hole through the safety glass. The driver's side and rear passenger's side doors were open. Newbill, who was in the driver's seat, was dead with a gunshot wound to his head. In order to avoid alerting the media, Officer Ryan returned to his car and sent an email to his sergeant about what he had discovered.

Crime scene technicians arrived at the scene and took pictures of Newbill and the car, and searched for fingerprints and DNA evidence. The radio in the car was still playing softly and the key in the ignition was turned back to accessory mode. The technicians noticed that the driver's side window was shattered, and it was evident that the source of the shot was inside the car. The technicians were unable to find any shell casings at the scene, which led them to believe they might be looking for a revolver as the murder weapon. They were able to find a bullet lodged in the driver's side door that was fired from the rear passenger seat, and had narrowly missed Newbill's chest before going through the armrest of the door and getting stuck inside. Another shot passed through the front passenger seat belt. Based upon Farmer's injuries, the technicians believed that one

5

of the wounds to Farmer's lower back could have occurred as a result of being shot while exiting the car. The wound to Farmer's upper back likely did not occur inside the car, but after Farmer had already exited the car.

Crime scene experts were successful in lifting twenty-two latent prints from the exterior of the car on the side where the murders took place. Out of those prints, some were matched to three individuals. Newbill's fingerprints were found around the outside of the driver's side door, and Rashondra Blake's fingerprints were found just under the window of the front passenger side door. Rashondra Blake is Brown's sister. The third set of prints belonged to Boyd and those fingerprints were found exclusively on the outside of the rear passenger side door. Investigators determined that the shooter was sitting in the rear passenger seat.

Boyd was interviewed by police detectives about the murders after Boyd's arrest on an unrelated charge. Boyd told the detectives that he had not seen his cousin, Newbill, for about a week and a half or two weeks. Boyd also told the officers that he had never seen the dark blue Dodge Stratus where Newbill was found. Boyd claimed that on the night of the murders he had been home alone from about 10:00 p.m. and then went to his uncle's party at around midnight. He indicated that he thought Newbill had been shot in the head and the chest.

Before detectives charged Boyd with murder, Jermon Gavin ("Gavin") approached detectives about Boyd. Gavin described his relationship with Boyd as very close, "like brothers." *Tr.* at 228. Gavin stated that while he and Boyd shared the same pod, or section, of the jail, Boyd had made some statements about the murder of Newbill and Farmer.

6

Gavin indicated that Boyd seemed very cocky about the murders and told him that other people did not understand what it was "like to wake up every day with a body" on their conscience. *Id.* at 231. Gavin further provided officers with details about Boyd's police interrogation including the fact that they had served him Barnaby's pizza during the interrogation, an uncommon occurrence known only by Boyd and the officers.

Gavin also told the officers that Boyd believed Newbill had been shot in the head and the chest, and that five shots had been fired. Although police officers had released information that Newbill had been shot in the head, none of the other information, such as that a gunshot had appeared to have been fired in the direction of Newbill's chest, was released to the public. Because Gavin was in jail at the time of the murders, he could not have been suspected of committing the murder.

Boyd admitted to Gavin that he, Newbill, and Farmer planned to commit a robbery that evening at a house on Laurel Street and Jefferson Boulevard. Farmer had brought along his .38 special revolver, and gave it to Boyd before they went to case the house they intended to rob. They parked the car down the road on Laurel Street, but returned to the car after casing the house. On the way back to the car and out of Farmer's earshot, Boyd and Newbill argued about whether Boyd could just take the gun from Farmer. Newbill told Boyd that if he were to "get into it" with Farmer, Boyd would have a problem with Newbill, too. *Tr.* at 232.

When the three men returned to the car, Newbill was in the driver's seat, Farmer was in the front passenger seat, and Boyd was in the rear passenger seat behind Farmer. An argument ensued after which Newbill grabbed the "do-rag" off of Boyd's head. *Tr.* at

7

233. Boyd shot Newbill in the head and fired another shot toward Newbill's chest. Newbill died almost immediately as a result of the gunshot wound to his head. Farmer got out of the car and attempted to escape. Boyd shot Farmer three times until the gun clicked. Farmer then fell to the ground, but did not immediately die from his injuries. Boyd then ran back to his house stating that the police were "everywhere." *Tr*. at 234. Boyd then told Gavin that he sold the gun to Javon Thomas ("Thomas"). Boyd was arrested on unrelated charges before the police had asked him questions about Newbill's murder.

The gun used in the murders was found during a routine traffic stop. Robert James ("James") was found in possession of the gun on August 3, 2012. The gun was a Charter Arms Undercover .38 special five-shot revolver. Prior to the discovery of the gun, Thomas had told police and Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") agents that he had purchased the gun from a guy he only knew as "D-Block," a man he later identified as Boyd. After lying to the police and ATF agents about having sold the gun in Detroit, Thomas admitted to hiding the gun in a bookbag immediately prior to his incarceration. From jail, Thomas asked his mother to get rid of the gun. The gun then ended up in James's possession, where it was discovered on August 3, 2012. The bullets recovered from Farmer's body and the door of the car were positively matched to the gun found during the traffic stop. That gun was the same gun Farmer had purchased months prior to his murder.

The State charged Boyd with two counts of Murder on July 6, 2012. On February 11, 2013, Boyd's jury trial began, and the jury found him guilty as charged on February 15, 2013. Boyd was sentenced to sixty years executed for each count and those sentences

were ordered to be served consecutively. Boyd now appeals.

## DISCUSSION AND DECISION

Boyd challenges the sufficiency of the evidence supporting his convictions for the murder of Newbill and Farmer. Our standard of review of a challenge to the sufficiency of the evidence is well established: We will not re-weigh the evidence or judge the credibility of the witnesses and will consider only the probative evidence and the reasonable inferences to be drawn therefrom that support the verdict. *McHenry v. State*, 820 N.E.2d 124, 126 (Ind. 2005). Consequently, we will affirm a conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Feyka v. State*, 972 N.E.2d 387, 392 (Ind. Ct. App. 2012). "It is therefore not necessary that the evidence 'overcome every reasonable hypothesis of innocence[;]'" rather, the evidence is sufficient if an inference reasonably may be drawn from it to support the trial court's decision. *Drane v. State*, 867 N.E.2d 144, 147 (Ind. 2007) (quoting *Moore v. State*, 652 N.E.2d 53, 55 (Ind. 1995)).

In order to establish that Boyd had committed two counts of murder, the State was required to prove beyond a reasonable doubt that Boyd knowingly or intentionally killed Newbill and Farmer. Ind. Code § 35-42-4-3. Boyd argues that the only issue at trial was the identity of the shooter and challenges the sufficiency of that evidence on appeal. *Appellant's Br*. at 20. "Identification testimony need not necessarily be unequivocal to sustain a conviction. . . . Elements of offenses and identity may be established entirely by circumstantial evidence and the logical inferences drawn therefrom." *Holloway v. State*, 983 N.E.2d 1175, 1178 (Ind. Ct. App. 2013) (internal citation omitted).

9

Regarding the identification evidence, Boyd challenges the fingerprint evidence citing to cases in which there was appellate review of the quantum of evidence needed to sustain a conviction based primarily on fingerprint evidence. *See Meehan v. State*, 986 N.E.2d 371 (Ind. Ct. App. 2013) (conviction reversed where only identification evidence was DNA found inside glove recovered at burglary scene); *and compare with Kenney v. State*, 908 N.E.2d 350 (Ind. Ct. App. 2009) (conviction affirmed where palm print evidence at crime scene was accompanied by other evidence of defendant's identity). Here, we conclude that Boyd's conviction was based upon more than just fingerprint evidence and that the quantum of evidence supporting his conviction is more like that of *Kenney*.

Six of Boyd's palm and fingerprints were recovered by technicians from the rear passenger seat of the dark blue Dodge Stratus where the shootings occurred. Forensic experts placed the murderer in the rear passenger seat. Boyd's fingerprints were found on the door frame and outside door handle of the rear passenger door, and no other person's fingerprints were found in that part of the car. Boyd's counsel offered only speculation about how Boyd's fingerprints got on the car. The fingerprint examiner and the technician that pulled the prints from the car testified that although fingerprints are capable of lasting for days and in the most ideal of conditions possibly weeks, fingerprints are 98% water by composition and are highly susceptible to environmental degradation from the elements, such as sun, morning dew, humidity, dust, and road grime. The evidence that the car was found parked outside and had been sitting in that position overnight until its discovery by Officer Ryan the next morning, tends to support the inference that the fingerprints were recently left and had not yet begun to degrade from the elements.

10

Holt, Boyd's cousin, testified that she saw Boyd walking from the location of the scene of the murders, not from Boyd's uncle's party, as he had stated to police officers, in the time frame immediately following the murders. Further, Boyd made statements about looking for the police, and made those statements prior to when the police began searching the area for the crime scene. Additionally, Gavin testified about Boyd's jailhouse confession, which included details—how many shots were fired until the gun clicked, the location of gunshot wounds, and that Boyd was served a particular kind of pizza—that were unknown to the public. Other testimony reflected that Boyd was the person who sold the murder weapon in the days after the murders.

To the extent Boyd challenges Gavin's testimony and Thomas's testimony, this request is an invitation for us to reweigh the evidence in light of the credibility of those witnesses, a task we may not undertake. *Stewart v. State*, 866 N.E.2d 858, 862 (Ind. Ct. App. 2007). Our review of the record reveals that the jury was apprised of those witnesses' pending cases and the attendant negotiations with law enforcement and the existence of any plea agreements. The jury was in the best position to evaluate the credibility of those witnesses and any motivations behind the testimony they supplied.

In sum, the identification evidence establishing Boyd as the person who committed the murders consists of much more than fingerprint evidence alone. Bullets recovered from the scene and from Farmer's body matched the gun found to be the murder weapon. Thomas's testimony, in which he identified Boyd as D-Block, the man from whom he purchased the gun later established to be the murder weapon, was corroborated by Gavin's testimony that Boyd confessed to selling the gun to Thomas. Any conflicts in Thomas's

11

account of what happened to the gun after he bought it from Boyd were for the jury to resolve. Thomas's account consistently, however, identified Boyd as the person who sold the gun. There was sufficient evidence in the record to support Boyd's conviction of the murders of Newbill and Farmer.

Affirmed.

ROBB, C.J., and RILEY, J., concur.