Garry F. MOORE, Appellant,

v.

STATE of Indiana, Appellee.

No. 64S00–9402–CR–145.

Supreme Court of Indiana.

June 22, 1995.

Rehearing Denied Nov. 22, 1995.

Lori L. Ferngren, Law Offices of James V. Tsoutsouris, Valparaiso, for appellant.

Pamela Carter, Atty. Gen. of Indiana and Lisa M. Paunicka, Deputy Atty. Gen., Indianapolis, for appellee.

SULLIVAN, Justice.

In September, 1993, the Porter Superior Court entered judgment after a jury found the defendant, Garry F. Moore, guilty of

Murder[1] and Robbery, a Class A felony,[2] in the Porter Superior Court.[3] Defendant urges us to reverse these convictions alleging: (1) the evidence was insufficient to sustain defendant's convictions for Murder and Robbery, (2) the trial court improperly denied the defendant's motions for mistrial, and (3) the trial court erred in sentencing defendant with consecutive sentences for Murder and Robbery.

I

The defendant contends that there was insufficient evidence to sustain his convictions because the State failed to present substantial direct evidence of probative value that the defendant murdered and robbed the victim. Our standard of review for claims challenging the sufficiency of the evidence is well settled. Whether the evidence is direct or circumstantial, we will not reweigh it or assess the credibility of witnesses. *Green v. State* (1992), Ind., 587 N.E.2d 1314; *Litel v. State* (1988), 527 N.E.2d 1114, 1115. Reviewing solely the evidence and the reasonable inferences from that evidence that support the verdict, we decide whether there is substantial evidence of probative value from which a reasonable jury could find the defendant guilty beyond a reasonable doubt. *Litel*, 527 N.E.2d at 1115; *Case v. State* (1984), Ind., 458 N.E.2d 223, 226. A conviction for Murder may be based purely on circumstantial evidence. *Green*, 587 N.E.2d at 1315 (citing *Moore v. State* (1990), Ind., 557 N.E.2d 665, 669). We will not disturb a verdict if the jury could reasonably infer that the defendant is guilty beyond a reasonable doubt from the circumstantial evidence presented. *Biggerstaff v. State* (1982), Ind., 432 N.E.2d 34, 36. On appeal, the circumstantial evidence need not overcome every reasonable hypothesis of innocence. *Swafford v. State* (1986), Ind., 498 N.E.2d 1188, 1192. It is enough if an inference reasonably tending to support the verdict can be drawn from the circumstantial evidence. *Id.*

The victim, Jerry Rogers, was employed as a foreman in the 160 Slab Yard at Bethlehem Steel in Burns Harbor, Indiana. The victim always carried a wallet with a substantial sum of money in it. A former girlfriend of the defendant testified that she believed that the defendant had borrowed money from the victim for approximately three years. The victim often loaned money to various other individuals.

On August 11, 1992, an employee at the 160 Slab Yard encountered the defendant in a slab yard office. The defendant angrily stated: "I'm going to fuck him up." When the employee asked the defendant why he was upset with the victim, the defendant stated: "You'll see. The last thing that I do, you'll see. I'm going to fuck him up." The employee asked the defendant how he planned to harm the victim. The defendant allegedly replied that he would remove a bar from an office safe and hit Rogers in the head.

On September 14, 1992, an employee at the 160 Slab Yard observed the defendant and the victim have a argument in the slab yard office. Although the employee was unable to determine exactly why they were arguing, she testified that the defendant allegedly stated: "Jerry, come on, man, come on." The victim allegedly responded: "No, no, I'm not going to stand here and argue with you. I done say all I had to say." The defendant angrily walked out of the office.

On the day of the murder, September 24, 1992, at approximately 6:30 a.m., a Bethlehem Steel security guard was stationed at an entrance to the mill. Vehicles with a Bethlehem Steel parking permit were not required to stop at the gate. Drivers of vehicles without a parking permit were required to stop at the gate and obtain a temporary permit to enter the mill. The security guard observed the defendant pass through the gate and drive into the mill without stopping

1. Indiana Code § 35–42–1–1 (1993).

2. Indiana Code § 35–42–5–1 (1993) provides that robbery is a Class A felony if it results in serious bodily injury to any person other than a defendant.

3. The jury also found the defendant guilty of Felony Murder, but judgment was not entered on that count.

even though his vehicle did not have a parking permit.

Also on September 24, between 6:00 a.m. and 6:30 a.m., an employee at the 80 Slab Yard observed the defendant driving a Thunderbird at a high rate of speed. This employee was aware that the defendant previously owned a Cadillac and noticed that the defendant parked his Thunderbird in the same place where he usually parked his Cadillac. Additionally, a 80 Slab Yard employee saw the defendant's vehicle parked near the 80 Slab Yard office at 6:15 a.m. on the day of the murder. When this same employee left the area at 7:00 a.m., the defendant's Thunderbird was not in the parking lot.

At 6:45 a.m. on the same morning, a 160 Slab Yard employee heard numerous cries for help being broadcast over an intercom system which could be heard throughout the slab yard and the slab yard office. The victim's body was found by Clyde Nichols, another 160 Slab Yard employee, when he arrived at the Foreman's Assembly Office shortly before 7:00 a.m. The victim had sustained a fatal head injury after being hit in the head with a metal bar which was found in the office and had been stabbed several times.

Nichols left the office and informed his co-worker, Don Oslander, of the victim's demise. Oslander ran to the Foreman's Assembly Office, located the victim's body and unsuccessfully attempted to resuscitate him. Oslander also checked the victim's back pockets and discovered that his wallet had been stolen.

Terry Barnes, a woman whom the defendant occasionally dated, testified that the day before the murder she accompanied the defendant to the credit union to obtain money with which to purchase cocaine. She also testified that the defendant left her home between 5:00 a.m. and 6:00 a.m. The defendant told Barnes that he was going to work at the mill. According to Barnes, the defendant called her several hours later, informed her that he had killed the victim at the mill, and requested her assistance in disposing of a wallet and some clothes.

Barnes also testified that the defendant came to her house sometime after 10:00 p.m. that same day and told her that he had argued with the victim, stabbed him with a knife, and hit him in the head with something. When Barnes asked the defendant why he killed Jerry Rogers, the defendant responded: "I did what I had to do." The defendant also stated that he advised police that he called the mill at 7:00 a.m. that morning from Barnes's home to report that he would not work that day. Barnes testified that she informed the defendant that she would not be his alibi and would reveal at what time he left her home that morning if the police so inquired. Barnes was hesitant to talk to the police at first; however, she eventually informed them of everything that the defendant allegedly told her regarding his killing and robbing the victim.

The defendant's former girlfriend, Brenda Porter, testified that the defendant called her the weekend after the murder and informed her that he had hurt someone in the mill and that he thought that person might be dead. Porter later received a second phone call from the defendant at which time she apprised him that she was upset because she had heard rumors that the he was telling people that they were together at the time of the murder. During this phone conversation, Porter rebuked the defendant's request that she let him tell police that they were together at the time of the murder; however, she did agree that, if asked, she would tell the police that she knew nothing about the murder. Porter did not keep her promise to the defendant. Saying that she refused to be an alibi for anybody, she informed the police of her previous conversations with the defendant and his admission to her that he thought he had killed someone at the steel mill.

We conclude that there was ample substantial evidence of probative value from which a reasonable jury could infer that the defendant was guilty beyond a reasonable doubt. There was evidence from which the jury could infer that the defendant could have been motivated to commit the murder and robbery to finance a cocaine addiction. The defendant had borrowed money from the

victim for many years and was aware that the victim carried substantial amounts of cash in his wallet. The defendant's co-workers witnessed a heated exchange between the defendant and the victim approximately one week prior to the murder and robbery. The defendant told one of his co-workers that he wished to hurt the victim.

There was evidence permitting a reasonable inference that the defendant had the opportunity to commit the murder and the robbery. Two witnesses saw the defendant park his car in the mill parking lot at approximately 6:30 a.m., and one of them noticed that the defendant's car was not in the parking lot at 7:00 a.m. Cries for help were heard over the slab yard office intercom system at approximately 6:45 a.m. Clyde Nichols found the decedent's stabbed and bludgeoned body at approximately 7:00 a.m.

There was other evidence, which if believed by the jury, directly links the defendant to the murder and robbery. The defendant left Terry Barnes's home the morning of the murder between 5:30 and 6:00 to go to the mill. He called Barnes hours later, informed her that he had killed the victim and asked her to help him dispose of a wallet and some clothes. The defendant also called Brenda Porter and told her that he thought that he had killed someone at the mill and asked her to corroborate his assertion that they were together at the time the crimes occurred. The jury was not required to believe the defendant's evidence. *Johnson v. State* (1989), Ind., 543 N.E.2d 358, 359. The jury had every right, as it did here, to believe the State's evidence instead. *Id.* Our review of the record convinces us that there was substantial evidence of probative value from which the jury could reasonably infer that the defendant was guilty of Murder and Robbery beyond a reasonable doubt. Accordingly, we reject the defendant's challenge to the sufficiency of the evidence.

## II

The defendant contends that the trial court improperly denied his motions for a mistrial where the prosecutor repeatedly used the word "murder" after being directed by the trial court to use the word homicide instead. In *Maldonado v. State* (1976), 265 Ind. 492, 498–99, 355 N.E.2d 843, 848, this Court set forth our procedure for deciding the validity of prosecutorial misconduct allegations and the effect a determination that misconduct occurred should have on convictions under review. First, the Court determines whether the prosecutor in fact engaged in misconduct. *Id.* Second, the Court decides whether any misconduct that occurred placed the defendant in a position of grave peril to which he should not have been subjected. *Id.* (quoting *White v. State* (1971), 257 Ind. 64, 78, 272 N.E.2d 312, 320). Third, in deciding whether the defendant was subjected to grave peril, we look at the probable persuasive effect of the misconduct on the jury, not the degree of impropriety of the conduct. *Id.* (citing *Swope v. State* (1975), 263 Ind. 148, 155, 325 N.E.2d 193, 196).

If prosecutorial misconduct occurred, we must determine whether this misconduct had a probable persuasive effect on the jury that placed the defendant in a position of grave peril such that the trial court should have granted the defendant's motions for a mistrial. A mistrial is an extreme remedy that is warranted when no other curative measure will rectify the situation and is a matter committed to the sound discretion of the trial court. *Szpyrka v. State* (1990), Ind., 550 N.E.2d 316, 318. The trial court is in the best position to gauge all the circumstances and the potential impact of misconduct on the jury when deciding whether a mistrial is appropriate. *James v. State* (1993), Ind., 613 N.E.2d 15, 23. Accordingly, the trial court has wide latitude in determining whether a mistrial should be declared for attorney misconduct, and absent a clear error in such ruling, this Court will not reverse. *Rufer v. State* (1976), 264 Ind. 258, 261, 342 N.E.2d 856, 858.

At trial, the prosecutor posed the following question to State's witness Priscilla Williams: "Did you consider Mr. Moore a friend of yours in September of '92 when this murder occurred?" The defendant objected to the question as follows:

Judge, I'm going to object. Mr. Douglas has used the word murder on many occasions. I refrained from commenting, but

that's enough. He knows that's wrong. We're here to decide whether or not there was a murder or not, and that's for the jury to decide. That's improper use of the phrase, and tainting the jury. This is a homicide, your Honor.

The prosecutor withdrew the question.

Subsequently, the prosecutor asked State's witness Jean Collins: "You were talking with Mr. Givens shortly after you found out about the murder." Defense counsel objected to the prosecutor's use of the term "murder." The prosecutor responded; "There has been sufficient evidence to say there was a murder." The trial court ruled, "Well, I guess in technical, legal sense, that's not true. In the vernacular, yes. Technical legal sense, I don't think it has been. So if we can stay away from the term."

In a subsequent question to State's witness Collins, the prosecutor stated, "The murder took place on the 24th of September." The defense objected to the use of the term "murder," and the prosecutor apologized for the "slip of the tongue."

Later, the prosecutor asked State's witness Thurman Williams: "Sometime after that murder occurred, did you have a conversation . . ." The defense objected to the use of the term murder. The trial court asked the prosecutor to restate the question.

Additionally, the following dialogue occurred between the defendant and the prosecutor on cross examination.

Q. You knew that's what the police were doing when they were talking to you and everybody else, in part, to establish if people had alibis for the time of the murder?

A. Well, I just thought they was just really asking questions, you know, about everybody. I didn't know that I had to have an alibi.

Q. Just asking for the heck of it, huh?

A. Well, they was doing their investigation, of course.

Q. What were they investigating? Withdraw that. Sorry.

. . . .

Q. And, in this statement, the one that you gave right after, the day after, the

murder—excuse me—well, I think it's a murder and I can say it in this examination, I think, can't I, Judge?

In a hearing outside the presence of the jury, the defendant moved for a mistrial on the basis of the prosecution's use of the word "murder." The prosecutor made the following response:

One, I apologize to the court if I violated the court's order with regards to referring to it as a murder. I certainly made no intent to disregard the court's order.

I have to admit the difference between calling this a homicide or a murder is very hard for me to follow or to understand. It seems to me that obviously a murder has been committed and it's a question of who. But I understand if the court wants or directs me to call it something other than that in examining this witness, I certainly will, And, again, I meant no disrespect, and I certainly was not trying to taint the jury, and I don't believe any of them would have been tainted.

The trial court denied the motion for mistrial and admonished the jury in the following manner.

Before we continue with the cross-examination, I want to admonish the jury to disregard the previous remarks of the prosecutor and anything regarding any motions that was said, and anything from the last question and answer, you should disregard and not consider as part of the evidence in this case.

During further cross-examination the prosecutor asked the defendant the following question. "Would it have anything to do that if they went out and checked, found out where you parked at the 80, that maybe they'd find out you were actually there at the scene of the murder on the 24th of September?" The defense objected to the question and moved for a mistrial. The trial court denied the motion for mistrial and admonished the jury.

 There is little doubt that the prosecutor here engaged in misconduct in not complying with the court's instructions. Implicit in the maxim that a court, in its pursuit of justice, has the inherent power to ensure

that its orders and judgments are carried out is the notion that counsel is obligated to adhere to the trial court's request to refrain from using certain language. *See Linton v. Linton* (1975), Ind.App. 166 Ind.App. 409, 339 N.E.2d 96, 97 (on rehearing). It follows that the prosecutor's repeated failure to comply with the trial court's request to refrain from using the word "murder" was misconduct.

While there was prosecutorial misconduct here, we cannot say that this misconduct had a probable persuasive effect on the jury that placed the defendant in a position of grave peril that warranted the declaration of a mistrial. Nor can we say that the trial court abused its discretion by denying the defendant's mistrial motions. The State presented evidence showing that several minutes prior to when the victim's body was found, cries for help were broadcast over the steel mill office intercom. The evidence revealed that the victim had multiple stab wounds to his chest and that there was a high probability that he would have bled to death as a result of these wounds. The evidence also showed that the victim sustained "defense type injuries" to his forearms that indicated he had put up his forearms to ward off the blows of his attacker. The autopsy results indicated that some blunt force object had been used to render an undeterminable number of blows to the victim's head. These blows were so severe that they caused lacerations to the victim's scalp, cranium, and brain itself. Finally, the decedent's mangled body was found entangled in a metal chair frame. This review of the record convinces us that there was ample evidence that a murder had occurred. While the prosecutor was under a duty to abide by the court's admonishment to use the word "homicide" rather than "murder," on this evidence we cannot perceive anything about the prosecutor's repeated use of the word "murder" that placed the defendant in grave peril and warranted the declaration of a mistrial.[4]

## III

■ The defendant contends that the trial court violated the constitutional prohibition against double jeopardy when it entered judgment and sentenced defendant for both Murder and Robbery. Specifically, defendant argues that he "was found guilty by the jury of murder while in the commission of robbery, and as only one death occurred, the events were necessarily the result of a single transaction. Thus, the consecutive sentence imposed by the court on the robbery conviction was improper because such sentence constitutes improper double punishment for the same offense and the [defendant] should have been sentenced on the greater offense only." Appellant's Br. at 23.

First, while defendant casts his argument in terms of the "consecutive sentence" being improper, we perceive his argument really to be that principles of double jeopardy prevented the trial court from entering a judgment of conviction on both the murder and the robbery counts and will treat his argument as such.

Second, while the jury found the defendant guilty of murder while in the commission of robbery (Felony Murder), it also found the defendant guilty of knowing and intentional murder. The trial court only entered judgment on the latter count. As such, the defendant has not been convicted of Felony Murder, only knowing or intentional murder. It would have been a violation of double jeopardy to convict and sentence defendant for both Felony Murder and the underlying robbery because conviction for Felony Murder could not be had without proof of robbery. *Harris v. Oklahoma*, 433 U.S. 682, 682, 97 S.Ct. 2912, 2912, 53 L.Ed.2d 1054 (1977); *Mitchell v. State* (1978), 270 Ind., 4, 7, 382 N.E.2d 932, 934. But because defendant was found guilty of knowing or intentional murder, he must demonstrate that the same act constitutes a violation of two distinct statutory provisions which do not require proof of an additional fact to sustain his double jeopardy claim. *Wethington v. State* (1990), Ind., 560 N.E.2d 496, 506 (quoting *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932)).

4. We strongly disapprove of the prosecutor repeatedly failing to comply with his obligation to adhere to the trial court's directive. On different facts, reversal might be required. *See Maldonado*, 355 N.E.2d at 848 (citing *Robinson v. State* (1973), 260 Ind. 517, 297 N.E.2d 409).

Clearly the statutes here contain mutually exclusive elements—the killing of another human being[5] and the taking of property from another person.[6] We have sustained convictions for knowing or intentional murder and robbery in the past, *Mitchell v. State* (1989), Ind., 541 N.E.2d 265, 271, *Flowers v. State* (1985), Ind., 481 N.E.2d 100, 106, and find those precedents applicable here.[7]

The State concedes that the Class A enhancement of defendant's conviction and sentence for robbery must be vacated. We agree. A defendant may not be convicted and sentenced for both Murder and Robbery (Class A) where the act that is the basis for elevating Robbery to a Class A felony is the same act upon which the murder conviction is based. *Mitchell*, 541 N.E.2d at 271. Accordingly, we remand this case to the trial court with instructions to vacate the Class A enhancement to the robbery conviction and sentence. Judgment of conviction may be entered, and Moore may be sentenced, for Robbery as a Class C felony.[8] We otherwise affirm the trial court.

SHEPARD, C.J., and DeBRULER, DICKSON and SELBY, JJ., concur.

---

5. Indiana Code § 35–42–1–1 (1993).

6. Indiana Code § 35–42–5–1 (1993).

7. The second prong of our double jeopardy analysis, the manner in which the offenses were charged, is not implicated here. *See Derado v. State* (1993), Ind., 622 N.E.2d 181, 183.

8. A Class B enhancement is not available since Moore was not charged with committing the robbery while armed with a deadly weapon. *Mitchell*, 541 N.E.2d at 271.