## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Kristina J. Jacobucci
Newby, Lewis, Kaminski & Jones, LLP
La Porte, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Katherine Modesitt Cooper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Marzano Shelly,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

March 17, 2015

Court of Appeals Case No.
46A03-1404-CR-133

Appeal from the La Porte Superior Court.
The Honorable Kathleen B. Lang, Judge.
Cause No. 46D01-1201-MR-31

**Baker, Judge.**

[1] Marzano Shelly appeals his convictions for Murder,[1] a felony, Felony Murder,[2] a felony, Robbery,[3] a class A felony, and Serious Violent Felon in Possession of a Firearm,[4] a class B felony. Shelly raises a number of issues, including whether his convictions violate the constitutional prohibition against double jeopardy. Finding that they do, we reverse and order the trial court to vacate Shelly's convictions for felony murder and class A felony robbery. On remand, the trial court is instructed to enter judgment of conviction on class C felony robbery and revise Shelly's sentence accordingly. We affirm the judgment of the trial court as to all other issues raised.

## Facts

[2] In 2012, seventy-three-year-old Charles Harper lived in a house in Michigan City with his friend, Vincent Fayson. On January 19, 2012, Shelly arrived at Harper's house and asked Fayson if Harper was available. Harper asked Shelly to come inside and gave Fayson some money so that he could leave the house and go out with his friends. Fayson left the house sometime around eight o'clock at night.

---

[1] Ind. Code § 35-42-1-1(1).

[2] I.C. § 35-42-1-1(2).

[3] I.C. § 35-42-5-1.

[4] Ind. Code § 35-47-4-5.

[3] Around 10:30 p.m., Fayson, still out with his friends, called Harper and received no answer. When Fayson returned to Harper's house later that night, Harper's truck was gone, but the lights and television were still on and the door to the house was unlocked. Fayson entered the house and noticed that a chair was propped underneath the doorknob to the kitchen door. Fayson removed the chair, opened the door, and found Harper lying in a pool of blood.

[4] Harper had been shot five times, including once in the back of the head and once in the face. Fayson contacted the police and informed them that Shelly was the last person he had seen with Harper. Later that evening, officers discovered Harper's truck parked at an apartment complex. The next morning, officers knocked on the door of an apartment at the complex belonging to Doris Parr, who invited them inside. The officers soon discovered Shelly hiding in the furnace room and arrested him.

[5] Officers then spoke with a woman who was in Parr's apartment when Shelly was arrested. She informed them that Shelly had been carrying a twelve-pack box of Icehouse beer and that he had attempted to hide the box when police arrived. After Parr consented to a search of her apartment, the officers found the Icehouse box hidden underneath Shelly's jacket in the furnace room. They searched the box and found, among other things, Harper's wallet, keys, two handguns, and ammunition.

[6] The State charged Shelly with murder, felony murder, class A felony robbery, and class B felony serious violent felon in possession of a firearm. The State

later requested an habitual offender sentence enhancement. Shelly filed a motion to suppress the evidence found inside the Icehouse box, which the trial court denied. Shelly also filed a motion asking the trial court to declare Jury Rule 20(a)(8), which allows jurors and alternates to discuss the evidence amongst themselves during recesses prior to the commencement of deliberations, unconstitutional. The trial court denied this motion as well.

[7] During the jury selection process, one of the prospective jurors, Gorski, informed the trial court that he believed one of Shelly's tattoos signified that he had previously murdered someone. Gorski said that he had shared these thoughts with other prospective jurors.

[8] Shelly moved for a mistrial. The trial court denied the motion, finding that any taint could be cured by individually questioning all of the prospective jurors. When questioned, only two prospective jurors indicated that they had discussed Shelly's tattoo with Gorski. Both prospective jurors, along with Gorski, were dismissed. No other prospective juror indicated that they had participated in or overheard such discussions and the trial court admonished all that remained that they must not speak about the case with anyone.

[9] Following jury selection, Shelly moved to discharge the jury panel, alleging that the prosecutor had made statements that improperly informed the jury of the facts of the case, misinformed the jury as to the elements of the crimes charged, and improperly commented upon Shelly's exercise of his right against self-incrimination. The trial court denied this motion as well.

On August 12, 2013, Shelly was tried before a jury. At the close of evidence, Shelly moved for a mistrial, alleging that the State had failed to disclose evidence of Harper's past criminal activity, about which Shelly had just learned. The trial court denied the motion, finding that there was not a reasonable probability that the evidence would have affected the outcome of the trial. The trial court also denied Shelly's request to instruct the jury on involuntary manslaughter.

The jury found Shelly guilty on all counts, and the trial court later found him to be an habitual offender. The trial court merged Shelly's conviction for felony murder with his conviction for murder. Shelly was sentenced to sixty-five years for the murder conviction, thirty years for the class A felony robbery conviction, ten years for the class B felony violent felon in possession of a firearm conviction, and thirty years for the habitual offender finding. With the exception of the class B felony violent felon in possession of a firearm sentence, which was to be served concurrently to the murder sentence, the trial court ordered all sentences to be served consecutively, resulting in a total executed sentence of 125 years. Shelly now appeals.

# Discussion and Decision

## I. Double Jeopardy

Shelly claims that the trial court has placed him in double jeopardy by entering judgments of conviction for murder, felony murder, and class A felony robbery.

Article 1, Section 14 of the Indiana Constitution provides that "[n]o person shall be put in jeopardy twice for the same offense."

[13] Shelly first argues that the trial court placed him in double jeopardy when it entered judgments of conviction for both murder and felony murder. Although the trial court merged the counts, Shelly points out that "[a] trial court's act of merging, without also vacating the conviction, is not sufficient to cure a double jeopardy violation." *Gregory v. State*, 885 N.E.2d 697, 703 (Ind. Ct. App. 2008). A double jeopardy violation is not remedied by the "practical effect" of concurrent sentences or merger of convictions. *Id.* On this point, the State agrees. Appellee's Br. p. 15.

[14] In its sentencing order, the trial court indicated that "[j]udgment of conviction is entered on Count II, Felony Murder." Appellant's App. p. 577. Although it later noted in the same order that both the murder and felony murder counts had been merged, *id.* at 578, this is insufficient to cure a double jeopardy violation. Accordingly, we must determine whether such a violation occurred.

[15] Here, Shelly was charged with both murder, as defined in Indiana Code section 35-42-1-1(1), and felony murder, as defined in Indiana Code section 35-42-1-1(2). Appellant's App. p. 21. To prove murder, the State had to prove that Shelly "knowingly and intentionally kill[ed] another human being." I.C. § 35-42-1-1(1). On the other hand, to prove felony murder, the State had to prove that Shelly "kill[ed] another human being while committing or attempting to commit . . . robbery." I.C. § 35-42-1-1(2).

[16] Two offenses are the same offense for purposes of Article I, Section 14 if, "with respect to *either* the statutory elements of the challenged crimes *or* the actual evidence used to convict, the essential elements of one challenged offense also establish the essential elements of another challenged offense." *Richardson v. State*, 717 N.E.2d 32, 49 (Ind. 1999) (emphasis original). While both murder and felony murder contain separate and distinct statutory elements, our Supreme Court has made clear that "[m]urder and felony murder constitute the same offense, and one may not be twice punished for a single homicide." *Shields v. State*, 493 N.E.2d 460, 460 (Ind. 1986).

[17] Since Shelly cannot be convicted of both murder and felony murder, a choice must be made. Shelly argues that his murder conviction should be vacated, but we cannot agree. This Court dealt with a nearly identical situation in *Fuller v. State*, and held that:

> when a defendant stands convicted of murder, felony murder, and an additional felony, the felony murder should be vacated and the murder conviction should remain. To hold otherwise would permit a person who commits an intentional murder while committing another felony to use the felony murder rule to escape punishment for the underlying felony. This simply cannot be. When a person intentionally murders a human being while committing another felony, punishment for both the killing and the other felony does not violate double jeopardy principles.

639 N.E.2d 344, 347-48 (Ind. Ct. App. 1994). We believe that this reasoning is sound. Consequently, on remand, the trial court is instructed to vacate the felony murder conviction.

[18] When Shelly's felony murder conviction is vacated, his convictions for murder and robbery will stand. Shelly does not argue that murder and robbery contain the same statutory elements, nor does he argue that each crime was proved by the same evidence. Clearly, murder and robbery "contain mutually exclusive elements—the killing of another human being and the taking of property from another person." *Moore v. State*, 652 N.E.2d 53, 60 (Ind. 1995). Accordingly, this Court has previously sustained convictions for both murder and robbery. *Id.* Shelly provides us with no reason as to why we should decide differently here.

[19] However, while convictions for both murder and robbery can stand, Shelly's conviction for robbery *as a class A felony* cannot. Class A felony robbery is an elevated form of robbery in which the robbery "results in serious bodily injury to a person other than the defendant." I.C. § 35-42-5-1.[5] "A defendant may not be convicted and sentenced for both Murder and Robbery (Class A) where the act that is the basis for elevating Robbery to a Class A felony is the same act upon which the murder conviction is based." *Moore*, 652 N.E.2d at 60. Such is the case here—Shelly's act of killing Harper serves as the basis for both his murder conviction and the elevation of his robbery conviction.

---

[5] We refer to provisions of the Indiana Criminal Code as they existed when Shelly committed the offense. Following amendments that became effective on July 1, 2014, this form of robbery is now a Level 2 felony. Similarly, class B felony robbery is now a Level 3 felony.

[20] The State suggests that we remedy this double jeopardy violation by reducing Shelly's robbery conviction to a class B felony. Class B felony robbery is that which "is committed while armed with a deadly weapon or results in bodily injury to any person other than the defendant." I.C. § 35-42-5-1. Once again, because the act that inflicted bodily injury—shooting Shelly—is the same act for which he was convicted of murder, it cannot serve as the act which elevates his robbery charge to a class B felony. Therefore, in order for Shelly to be convicted of class B felony robbery, the jury would have had to find that Shelly was armed with a deadly weapon.

[21] While the jury found Shelly guilty of class A felony robbery, "the Class B charge is not necessarily included in the Class A offense." *Kingery v. State*, 659 N.E.2d 490, 496 (Ind. 1995). We therefore must look to the final jury instructions to determine whether the jury found that Shelly used a deadly weapon and, thus, convicted him of class B felony robbery. The jury was instructed on the class A robbery charge as follows:

> Before you may convict the Defendant, the State must have proved each of the following beyond a reasonable doubt:
> One, the Defendant;
> Two, knowingly or intentionally;
> Three, took property from the presence of Charles Harper;
> Four, by using or threatening to use the use of force on Charles Harper;
> Five, and the commission of elements one through four resulted in serious bodily injury to Charles Harper.

Tr. p. 2081.

As is evident from the above instructions, the jury was not asked to find that Shelly used a deadly weapon. Therefore, the jury did not convict Shelly of class B felony robbery in this instance. "A person cannot be sentenced for a crime for which that person has not been convicted." *Kingery*, 659 N.E.2d at 496. Consequently, we may not reduce Shelly's robbery conviction to a class B felony. However, as the above instructions do contain all of the elements of robbery as a class C felony, on remand, the trial court is instructed to enter judgment of conviction on class C felony robbery and revise Shelly's sentence accordingly.

## II. Search of the Icehouse Box

Prior to trial, Shelly moved to suppress the evidence that officers discovered in the box of Icehouse beer that he attempted to hide in Parr's apartment shortly before he was arrested. The trial court denied this motion, finding that Shelly did not have a reasonable expectation of privacy in the Icehouse box because, among other reasons, "a beer box is a beer box." Appellant's App. p. 186.

The trial court has broad discretion to rule on the admissibility of evidence. *Guilmette v. State*, 14 N.E.3d 38, 40 (Ind. 2014). We review its decision to admit evidence for an abuse of discretion and will reverse only when the decision is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights. *Id.*

While Shelly acknowledges that Parr had consented to the search of her apartment, he maintains that the officer's warrantless search of the Icehouse

box without his consent violated his constitutional rights. Shelly draws our attention to *Krise v. State*, 746 N.E.2d 957 (Ind. 2001). In *Krise*, Krise's roommate consented to a search of the house that the two lived in together. *Id.* at 960. Once inside the house, officers found Krise's purse, opened it, and found that it contained drugs. *Id.* Our Supreme Court held that this search violated Krise's rights against unreasonable search and seizure protected by the Fourth Amendment to the United States Constitution. *Id.* at 959.

[26] The Court first looked to Krise's subjective expectation of privacy in both the area and the personal item searched, and then considered whether this expectation was objectively reasonable. In regard to the area searched, the Court noted that Krise's "purse was located inside her home and thus was not accessible to the general public." *Id.* at 970. In regard to the item searched, the Court noted that "'[p]urses are special containers'" as "'they are repositories of especially personal items that people generally like to keep with them at all times.'" *Id.* (quoting *Wyoming v. Houghton*, 526 U.S. 295, 310 (1999) (Breyer, J., concurring)). Under these circumstances, the Court found Krise's expectation of privacy both subjectively and objectively reasonable.

[27] The facts here are easily distinguishable. First, unlike in *Krise*, the object Shelly seeks to protect was not found in his own home. Rather, as Shelly left the Icehouse box in the home of another, his expectation of privacy was diminished accordingly. Second, the Icehouse box is not a "repository[y] of highly personal items" but, rather, a repository of beer.

Shelly argues that he was unable to afford a purse or similar container, and "[i]ndigent persons should not be afforded less protection under the Fourth Amendment simply because of their indigent status." Appellant's Br. p. 30. He argues that, because society has recognized that a person's expectation of privacy in their purse is objectively reasonable, society recognizes, or perhaps should recognize, a similarly reasonable expectation of privacy that those who cannot afford purses have in whatever object they use to carry their belongings.

However, we need not consider how society would view Shelly's expectation of privacy in the Icehouse box, because Shelly has not shown that he, himself, had such an expectation of privacy. First of all, it is questionable whether the Icehouse box even belonged to Shelly.[6] Furthermore, Shelly did not present any evidence, nor does he claim, that he normally carried his personal belongings in beer boxes or similar containers.

In fact, to show a subjective expectation of privacy, Shelly points only to the fact that he tried to hide the Icehouse box when the police arrived. Here, Shelly conflates a *desire* for privacy with an *expectation* of privacy. We do not doubt

---

[6] At the hearing on Shelly's motion to suppress, the following exchange took place:

State:   Judge, I don't even think the box was his, was it? Judge, not even the box was . . . even, not even the box, just, just briefly. Not even the Icehouse box was the defendant's because he took that as well from the decedent's . . .

Court:   Okay.

State:   . . . residence.

Defense: Judge, that's not in the record. That's nowhere [in] testimony . . .

Tr. p. 100.

that Shelly did not want the officers to find the Icehouse box and its contents. However, Shelly's attempt to hide the box indicates only that he did not want the officers to find evidence of a crime, not that he had a subjective expectation of privacy in the box.

[31] Finally, we find that the search of the Icehouse box was reasonable under Article I, Section 11 of the Indiana Constitution. Under the Indiana Constitution, "the legality of a governmental search turns on an evaluation of the reasonableness of the police conduct under the totality of the circumstances." *Perez v. State*, 981 N.E.2d 1242, 1251 (Ind. Ct. App. 2013), *trans. denied*. In making our determination, we consider: (1) the degree of concern, suspicion, or knowledge that a violation occurred; (2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities; and (3) the extent of law enforcement needs. *Id.*

[32] In this case, these factors weigh in favor of concluding that this search was reasonable. When police searched the Icehouse box they knew that someone had been murdered and that Shelly, their primary suspect, had recently possessed the box. The search imposed no intrusion into Shelly's ordinary activities, as he was under arrest at the time and the Icehouse box was located in another person's home. Finally, officers had received the consent of the homeowner and had no reason to suspect that the Icehouse box was Shelly's property or that he had a reasonable expectation of privacy in it or its contents. Under the totality of the circumstances, the officers' search of the Icehouse box

was reasonable. Consequently, the trial court did not err in admitting this evidence.

## III. Prosecution's Statements to the Jury

[33] Shelly next argues that the prosecution made several statements that tended to condition the jury in the prosecution's favor during voir dire. Shelly claims that the State attempted to implant in jurors' minds ideas about the substantive facts of the case. He also claims that the State improperly commented on his decision not to testify.[7]

[34] A trial court has broad discretion to regulate the form and substance of voir dire. *Adcock v. State*, 933 N.E.2d 21, 26 (Ind. Ct. App. 2010). Parties may question prospective jurors to determine their attitudes towards the charged offense and whether they hold any preconceived ideas about defenses that the defendant intends to use. *Id.* "In making these determinations, the parties may pose hypothetical questions, provided they do not suggest prejudicial evidence not adduced at trial." *Id.*

[35] Regarding Shelly's decision not to testify, during voir dire, defense counsel engaged in the following exchange with a prospective juror:

---

[7] Although Shelly accuses the prosecution of making improper statements, his brief does not identify these statements and contains no citation to these statements in the record. Appellant's Br. p. 8-9, 31-32. We remind Shelly that each contention made in the argument section of appellate briefs "must be supported by citations to the authorities, statutes, and the Appendix or parts of the Record on Appeal relied on . . . ." Ind. Appellate Rule 46(A)(8)(a). To the extent that Shelly refers to statements that we have not identified above, we find that he has waived his argument as to any error arising from these statements.

| | |
|---|---|
| Defense: | You understand that he's uh, he doesn't have to testify, he doesn't have to say anything. Everybody understand that? You ever watch TV and ever heard about Fifth Amendment before? |
| Juror: | Uh huh. |
| Defense: | Alright, you can't use that against him, you can't hold that against him right? |
| Juror: | Correct. |

Tr. p. 584. The following day, the State engaged in the following exchange with a prospective juror:

| | |
|---|---|
| State: | Relative to why someone wouldn't testify, do you think that if someone were to . . . willing to lie to the police they would be willing to lie in court? |
| Juror: | I would hope not. |
| State: | Well, again, yes, we, we all hope that, but if someone takes the oath that they're, but for a reason not to testify, I mean that was discussed yesterday, okay. |
| Defense: | Your Honor, objection . . . . |

Tr. p. 680. The State argued that defense counsel had begun this line of questioning the day before, and that it was just trying to explore the area further. The trial court sustained the objection as to any reference by the State regarding Shelly's decision not to testify. *Id.* at 681.

[36] "The Fifth Amendment privilege against compulsory self-incrimination is violated when a prosecutor makes a statement that is subject to reasonable interpretation by a jury as an invitation to draw an adverse inference from the defendant's silence." *Boatright v. State*, 759 N.E.2d 1038, 1043 (Ind. 2001). However, after reviewing the exchange above, we cannot say that the State presented the jury with such an invitation. It is simply not clear where the State

was going with this line of questioning. The State's question, while confusing, does not appear improper as is. We can only speculate as to whether improper comments would have followed had the State been allowed to continue. If improper comments would have followed, the objection served its purpose.

[37] Shelly next asserts that the State improperly informed the jury of the facts of the case. In this instance, Shelly failed to object when the alleged misconduct occurred. Accordingly, he has waived his claim unless he can demonstrate fundamental error. *Castillo v. State*, 974 N.E.2d 458, 468 (Ind. 2012). To show this, he must establish that "the misconduct made a fair trial impossible or constituted clearly blatant violations of basic and elementary principles of due process or that the misconduct presented an undeniable and substantial potential for harm." *Id.* (quotations omitted).

[38] During voir dire, the State questioned a juror who stated that he had recently retired. The following exchange took place:

> State: Congratulations. How old are you? I hate to ask.
>
> Juror: Seventy.
>
> State: In this particular case, Mr. Harper, the decedent, was 73. Do you feel like that, being that close in age may create kind of a conflict or would that cause you to be impartial? Weigh some, something in . . . towards his benefit or not or do you think you'd be able to just set that aside?

Tr. p. 541-42. On another occasion, the State informed the jury as follows:

> State: In, in this particular case, the Defendant has filed a Notice of Self-Defense. Did everybody hear that? Self-defense? And which means a couple of things. He's not disputing the fact

that Mr. Harper is dead and that he was the person who shot and killed Mr. Harper.

I can repeat that again. He's not disputing that Mr. Harper is dead, or that he's the person who caused the death. . . . [J]ust wanted to make sure you understand that that's not an issue in this particular case. This is not a "who done it."

Tr. p. 451.

[39] The impropriety of these statements is apparent from the moment the State utters the phrase "in this particular case." Voir dire is not the place for discussion of the facts of a particular case. *Blackburn v. State*, 271 Ind. 139, 142, 390 N.E.2d 653, 656 (Ind. 1979). Our Supreme Court has made clear that "[i]t is not the function of jury voir dire examination to 'Inform' the prospective jurors of anything. Rather, it is to ascertain whether or not they can render a fair and impartial verdict in accordance with the law and the evidence." *Id.*

[40] The State argues that it was simply asking the jurors "whether they could be impartial and whether the proximity in age created any conflict . . . ." Appellant's Br. p. 34. We recognize that "[i]t is not improper to inquire of prospective jurors if their own personal feelings could be influenced by such facts being presented so that the parties might know that an impartial and unprejudiced jury is trying their cause." *Barnes v. State*, 435 N.E.2d 235, 238 (Ind. 1982). However, these questions should be posed in general terms—they should never refer to the specific facts of a case.

[41] Similarly, in a case in which self-defense is at issue, both parties may properly inquire into jurors' beliefs regarding such a defense. Once again, a general

question would adequately serve this purpose. However, the State's above-quoted articulation of self-defense as it applied to Shelly's case in particular was highly improper. Such statements were clearly not designed to discover whether jury members could properly perform their duty—which is the *entire* purpose of voir dire—as the State did not even pretend to present these statements in the form of questions. Simply put, the State may not use voir dire as an opportunity to make an opening statement. Had an objection been made, it would have been sustained.

[42] That being said, these improprieties do not rise to the level of fundamental error. Here, we do not have a situation in which "the questions propounded by the prosecutor were designed solely to inflame the prejudices of the jury rather than uncover what prejudices could keep them from rendering a fair verdict." *Bane v. State*, 587 N.E.2d 97, 102 (Ind. 1992) (citing *Robinson v. State*, 260 Ind. 517, 519, 297 N.E.2d 409, 411 (Ind. 1973)).[8] Rather, we have a situation where the questions and statements were designed to do neither of these things. The State simply used voir dire to prematurely inform the jurors of some of the facts of this case. While this was clearly improper, the State's representations were

---

[8] In *Robinson v. State*, the State asked prospective jurors: "If a father killed his twenty year old daughter because she resisted his sexual advances, could you vote for the death penalty then?" 260 Ind. at 519, 297 N.E.2d at 411. The Court noted that "[t]he facts assumed by this question, although hypothetically stated bore a striking resemblance to the facts of the case at hand." *Id.* Furthermore, the question implied an incestuous relationship when there was no evidence presented to that effect at trial. Our Supreme Court found this to be reversible error. Here, although the State has improperly informed prospective jury members of the facts of the case, none of its representations were inaccurate or misleading.

not inaccurate or misleading. Under these circumstances, we do not believe that this error prejudiced Shelly or presented a substantial potential for harm.

## IV. Improper Discussions Between Prospective Jurors

[43] During jury selection, a prospective juror came forward and informed the trial court that another prospective juror, Gorski, had shared his opinion as to Shelly's guilt. Gorski informed the juror that he believed one of Shelly's tattoos meant that he had killed somebody. Gorski told the prospective juror that he had looked this up online and that he believed Shelly was guilty. Tr. p. 851. The trial court asked the juror if Gorski was speaking to multiple jurors or if any other jurors had overheard. The prospective juror told the court that he didn't believe anyone had overheard.

[44] The trial court questioned Gorski and learned that he had shared his belief with a total of two prospective jurors. Shelly moved for a mistrial, but the trial court denied the motion, reasoning that any taint could be cured by individually questioning all prospective jurors. During questioning, two prospective jurors informed the court that Gorski had spoken directly to them about his beliefs. Both of these jurors, along with Gorski, were dismissed. Tr. p. 997, 1199. No other juror indicated that they had overheard these conversations. Shelly argues that the trial court erred in denying his motion for mistrial.

[45] "A trial court is in the best position to evaluate whether a mistrial is warranted because it can assess first-hand all relevant facts and circumstances and their

impact on the jury." *Ramirez v. State*, 7 N.E.3d 933, 935 (Ind. 2014). Therefore, we review the denial of a motion for mistrial for an abuse of discretion. *Id.*

[46] When seeking a mistrial for suspected jury taint, defendants are entitled to a presumption of prejudice after making two showings: (1) extra-judicial contact or communications between jurors and unauthorized persons occurred, and (2) the contact or communications pertained to the matter before the jury. *Id.* at 939. In this case, there was no extra-judicial contact between jurors and unauthorized persons. Rather, the contact complained of occurred between prospective jurors.

[47] However, assuming that Shelly is entitled to a presumption of prejudice, it then falls to the State to rebut that presumption by showing that the contact or communication was harmless. *Id.* In this case, we find that the actions taken by the trial court subsequent to learning of these communications were appropriate and rendered the communications harmless.

[48] Our Supreme Court has instructed trial courts to "immediately investigate suspected jury taint by thoroughly interviewing jurors collectively and individually, if necessary." *Id.* at 940. Here, after learning of Gorski's comments, the trial court interviewed all prospective jurors individually. Tr. p. 897-952. Those who were involved in the conversations with Mr. Gorski were dismissed from the jury. Tr. p. 997, 1199.

[49] Although Shelly argues that the jurors could have overheard these conversations, none of the jurors indicated that they had. Shelly does not

indicate how he was otherwise prejudiced. We find the trial court's actions appropriately remedied the situation and that Shelly was not entitled to a mistrial under the circumstances.

# V. Involuntary Manslaughter Instruction

Shelly next argues that the trial court erred in failing to instruct the jury on involuntary manslaughter. Instruction of the jury is within the sole discretion of the trial court and is reviewed only for an abuse of discretion. *Bayes v. State*, 791 N.E.2d 263, 264 (Ind. Ct. App. 2003).

When a defendant requests a jury instruction on what the defendant believes is a lesser-included offense of the crime charged, the trial court must conduct a three-part analysis. *Wright v. State*, 658 N.E.2d 563, 566 (Ind. 1995). The first two parts of the analysis require the trial court to determine if the offense is either inherently or factually included in the crime charged. *Ketcham v. State*, 780 N.E.2d 1171, 1177 (Ind. Ct. App. 2003). If so, the trial court then proceeds to the final step, where it must determine if there is a serious evidentiary dispute regarding any element that distinguishes the two offenses. *Id.*

> If there is a serious evidentiary dispute about the element or elements distinguishing the greater from the lesser offense and if, in view of this dispute, a jury could conclude that the lesser offense was committed but not the greater, then it is reversible error for a trial court not to give an instruction, when requested, on the inherently or factually included lesser offense.

*Wright*, 658 N.E.2d at 567.

[52] Both parties agree that involuntary manslaughter is not an inherently included offense of murder. Appellant's Br. p. 26; *Wright*, 658 N.E.2d at 569. However, involuntary manslaughter "may be a factually included lesser offense if the charging information alleges that a battery accomplished the killing." *Ketcham*, 780 N.E.2d at 1177. This is because "[t]he only element distinguishing murder from involuntary manslaughter is what the defendant intended to do—batter or kill." *McEwen v. State*, 695 N.E.2d 79, 86 (Ind. 1998). In *Ketcham*, this was the case, as the charging information alleged that Ketcham killed his victim by shooting him with a deadly weapon. *Id.* This Court found that, because shooting is a battery,[9] the charging information alleged a battery, and involuntary manslaughter was factually included in the murder charge. *Id.* at 1178.

[53] Here, the charging information does not allege that a battery accomplished the killing. The charging information simply provides that "Shelly, did knowingly or intentionally kill another human being, to wit; Charles Harper." Appellant's App. p. 21. Without any mention of the means by which Shelly killed Harper in the information, we simply cannot conclude that the charge alleged a battery. Consequently, involuntary manslaughter was not factually included in the murder charge, and the trial court did not err in denying Shelly's request for the jury instruction.

---

[9] A person commits battery when he "knowingly or intentionally touches another person in a rude, insolent, or angry manner." I.C. § 35-42-2-1.

Moreover, even if involuntary manslaughter had been factually included in the murder charge, we agree with the trial court's conclusion that no serious evidentiary dispute existed as to whether Shelly intended to kill Harper. "When one shoots another person multiple times at close range, a reasonable jury could infer that the shooter's intent was to kill, not batter, the victim." *Collins v. State*, 966 N.E.2d 96, 104 (Ind. Ct. App. 2012). Here, the evidence showed that Shelly shot Harper five times, including once in the face and once in the back of the head. The trial court did not err in concluding that an instruction on involuntary manslaughter was improper in light of such evidence.

## VI. Harper's Criminal History

At the close of evidence, Shelly learned that Harper had a criminal history that the State had failed to disclose. In particular, Harper was charged with threatening the President of the United States in 1967, unlawful use of a weapon in 1971, and resisting law enforcement in 1972.[10] Defendant's Ex. A. Shelly moved for a mistrial and the trial court denied his motion. Once again, we will review the trial court's decision to deny a motion for mistrial for an abuse of discretion. *Ramirez*, 7 N.E.3d at 935.

It is unknown whether Harper was convicted of any of these offenses,[11] but Shelly argues that, had he been informed of this history, he "could have

---

[10] Harper had also been charged with other, nonviolent crimes. Defendant's Ex. A.

[11] Both parties agree that a letter from the United States Department of Justice "tended to establish that Harper had been convicted" of threatening the President in 1967. Appellee's Br. p. 19; Defendant's Ex. B.

introduced reputation or opinion evidence of Charles Harper's character for aggressiveness."[12]  Appellant's Br. p. 25.  In *Holder v. State*, our Supreme Court explained:

> Evidence of the victim's character may be admitted for either of two distinct purposes: to show that the victim had a violent character giving the defendant reason to fear him or to show that the victim was the initial aggressor.
>
> Evidence of specific bad acts is admissible to prove that the victim had a violent character which frightened the defendant.  However, only general reputation evidence of the victim's violent nature is admissible to prove that the victim was the initial aggressor.
>
> If the defendant wishes to introduce either type of character evidence, she must first introduce appreciable evidence of the victim's aggression to substantiate the self-defense claim.  When offering specific bad acts evidence to prove the victim's violent character frightened her, the defendant must also prove a foundation showing that she knew about the specific bad acts in question before she killed the defendant.

571 N.E.2d 1250, 1254 (Ind. 1991) (citations omitted).

[57] Because it is undisputed that Shelly did not know of these decades-old charges against Harper, he does not argue that he should have been allowed to present the charges themselves as evidence of specific bad acts.  Appellant's Br. p. 25.  Instead, Shelly appears to argue that, had he known of these charges, he would have presented reputation or opinion evidence of Harper's violent nature to

---

[12] On appeal, Shelly makes a brief reference to *Brady v. Maryland*, 373 U.S. 83 (1963), when he notes that "[f]ailure to turn over such exculpatory evidence may result in a violation of the defendant's due process rights under the Fifth Amendment of the United States Constitution."  Appellant's Br. p. 24.  However, as Shelly fails to argue that his due process rights were actually violated in this case, we need not conduct the *Brady* analysis.

show that Harper was the initial aggressor. *Id.* However, even to do this, Shelly was first required to introduce "appreciable evidence of the victim's aggression to substantiate the self-defense claim." *Holder*, 571 N.E.2d at 1254. Shelly does not argue that he did this, nor is it apparent from the record. Shelly also fails to explain exactly how his lack of knowledge of these decades-old charges prevented him from introducing reputation or opinion evidence as to Harper's violent nature. Therefore, the trial court did not err in denying his motion for a mistrial.[13]

[58] The judgment of the trial court is affirmed in part and reversed in part. The cause is remanded to the trial court to vacate Shelly's convictions for felony murder and class A felony robbery, enter judgment of conviction on class C felony robbery, and revise Shelly's sentence accordingly.[14]

Vaidik, C.J., and Riley, J., concur.

---

[13] Shelly also argues that the trial court erred in denying his motion to declare Indiana Jury Rule 20(a)(8), which allows jurors and alternates to discuss the evidence amongst themselves during recesses prior to the commencement of deliberations, unconstitutional. This Court has previously addressed the same argument in *Weatherspoon v. State*, 912 N.E.2d 437 (Ind. Ct. App. 2009), in which we found no constitutional violation. We decline Shelly's invitation to revisit this issue.

[14] Given that the trial court must resentence Shelly, we cannot entertain his claim for a reduction of his sentence under Indiana Appellate Rule 7(B) at this time. Therefore, we dismiss Shelly's Rule 7(B) claim without prejudice.