## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 14 2016, 8:41 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Amy D. Griner
Mishawaka, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Justin F. Roebel
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Thomas Harper,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

July 14, 2016

Court of Appeals Case No.
20A03-1512-CR-2150

Appeal from the Elkhart Circuit Court.
The Honorable Terry Shewmaker, Judge.
Cause No. 20C01-1410-FA-2

**Barteau, Senior Judge**

# Statement of the Case

[1] Thomas Harper appeals his conviction for burglary resulting in bodily injury, a Class A felony.[1] We affirm.

# Issue

[2] The sole issue Harper raises for our review is whether the State presented sufficient evidence to sustain his conviction.

# Facts and Procedural History

[3] A burglary and shooting took place on January 23, 2014, at a house located at 1415 Franklin Street in Elkhart County. The temperature that day was approximately eight degrees Fahrenheit, and there was snow on the ground. At the time of the incident, a gas station and convenience store called the Burger Dairy was located next door to the Franklin Street house. Gurcharn Singh owned the Burger Dairy.

[4] The Franklin Street house is divided into two apartments, an upstairs apartment and a downstairs apartment. Peter Fernandes and Arnaldo Vales lived in the upstairs apartment. Harsimratpal Singh and Gurpreet Singh lived in the downstairs apartment. Peter, Gurpreet, and Harsimratpal worked for Gurcharn. Harsimratpal and Gurpreet worked at the Burger Dairy. Peter

---

[1] Ind. Code § 35-43-2-1 (1999).

worked at another gas station owned by Gurcharn that was located further from the Franklin Street house. [2]

[5] Harsimratpal left work early in the morning of January 23, 2014, returned to his downstairs apartment, and went to sleep. Peter and Arnaldo left the upstairs apartment that morning and went to Peter's place of employment. At some point, Harsimratpal heard loud noises coming from the upstairs apartment. He called Gurcharn. Gurcharn left the Burger Dairy and went to the Franklin Street house to investigate.

[6] Gurcharn climbed the stairs and approached the door to the upstairs apartment. He noticed there was damage to the door. He testified "[t]he door was smashed where the locks, the handles, is [sic] and all that [sic] like very bad smashed and somebody tried to break in . . . and nobody went inside because the door was still locked." Tr. p. 104. Gurcharn descended the stairs and returned to work. Harsimratpal called Gurpreet and told him someone had broken the door to the upstairs apartment.

[7] Shortly thereafter, Gurcharn received another call from Harsimratpal, asking him to return to the house because Harsimratpal again heard loud noises coming from the upstairs apartment. Gurcharn returned, and he and Harsimratpal stood talking outside of Harsimratpal's apartment, near the stairs

---

[2] Testimony was presented at trial that indicated Arnaldo also worked for Gurcharn and worked at the gas station with Peter.

leading to the upstairs apartment. A man with a handgun emerged from the upstairs apartment, descended the stairs, and shot at Gurcharn and Harsimratpal. The man fired the gun three or four times. Gurcharn described the man as "around [twenty years old]," "normal size," and five feet, five inches in height. *Id*. at 108.

[8] Gurcharn was shot once in each knee. Harsimratpal was shot once in the back. The shooter ran from the residence. Gurpreet, who had walked to the Franklin Street house from the Burger Dairy, witnessed the shooting. After the shooter fled the scene, Gurpreet went back to the gas station, encountered a police officer who was pumping gas, and reported the incident to the officer. Gurcharn and Harsimratpal were transported to the hospital for treatment.

[9] When police from the Elkhart City Police Department arrived at the Franklin Street house, they cordoned-off the area and began an investigation. One officer found a laptop computer laying on the landing at the top of the stairs leading to the upstairs apartment, just outside of the apartment door.[3] The officer also observed part of the metal locking mechanism for the door frame and some splintered wood laying on the floor, outside of the entrance to the apartment, near the laptop. The officer found a bullet embedded in the siding

[3] Arnaldo testified he had 5,000 Indian Rupees in a suitcase in the apartment when he left the apartment on the morning of January 23, 2014. When he returned, the money was gone. The money was not recovered.

of the house.  A firearms expert determined the bullet could have been fired from a .22 caliber long handgun.

[10] During the investigation of the crime scene, police officers found footprints in the snow that they believed belonged to the suspect.  The police also found a laptop power cord laying in the snow, in the middle of a street near the burgled apartment, and additional footprints near the cord.  An evidence technician found a footprint on the door of the upstairs apartment.

[11] The police tracked the footprints away from the scene, through an alley, and to a residence located at 513 Oakland Avenue in Elkhart County.  Approximately thirty to forty minutes passed between the time police officers were first alerted to the burglary/shooting and the officers' arrival at the Oakland Avenue house.  The police surrounded the house.

[12] The Oakland Avenue house has a common-entrance door.  Inside of the common entrance are two separate doors leading to apartment A and apartment B.  Apartment A is the downstairs apartment and apartment B is the upstairs apartment.

[13] Officers knocked on both apartment doors.  No one answered the door at apartment B.  The occupant of apartment A answered the door and told officers "she had just spoken with someone and allowed them to use [her cell] phone." *Id.* at 263.  The occupant later identified the person who used her phone as Harper.  She testified at trial Harper used her cell phone to call his cousin

"D.J.", [4] and asked his cousin to "pick him up." *Id*. at 282, 289. The call was made at 12:38 p.m. Evidence was presented that indicated Harper went to apartment B after using the cell phone.

[14] After assessing the situation at the Oakland Avenue house, the police requested assistance from the Special Response Team (SRT). [5] The SRT arrived at approximately 2:45 p.m. A member of the team used a bullhorn to call to the individual in the apartment and ask the individual to "come down with your hands up." *Id*. at 339. At this same time, the 911 dispatch center received a call from an individual stating "they were in the upstairs apartment, [sic] they were confused what was going on." *Id*. at 352. The dispatch center advised the individual to go downstairs with his hands up. Harper eventually emerged from the apartment approximately ten to fifteen minutes after the SRT arrived and was transported to the Elkhart County Jail.

[15] Jerome Wilson was the renter of the upstairs apartment at the Oakland Avenue house. Harper had spent the night in Wilson's apartment but left the apartment the morning of January 23, 2014, when Wilson left to go visit his father. Wilson locked the apartment door when he left. Wilson returned to his home when he was told by relatives the Oakland Avenue house was surrounded by police officers. After the SRT cleared the apartment and Harper was taken into

---

[4] The full name of the person referred to as "D.J." is D'Andre Goodwin, Jr.

[5] The SRT is a team of Elkhart police officers that assist with high-risk search warrants, high-risk arrests, and hostage situations.

custody, a police detective obtained consent from Wilson to search his apartment.

[16] Incident to the search, police found on the floor of a closet a pair of gray sweatpants and a pair of black, gray, and red colored athletic shoes. The bottoms of the legs of the sweatpants were wet, and the soles of the shoes also were wet. A forensic analyst with the Indiana State Police Laboratory determined the right shoe found in the apartment matched the footprint that the intruder left on the door of the apartment that was burgled. The police also found a videogame case that contained U.S. currency. Harper's fingerprints were found on the case.[6] When police officers left the scene of the upstairs apartment at 513 Oakland Avenue, they locked the doors leading to the apartment.

[17] On January 24, 2014, the day following the incident, a detective with the Elkhart Police Department decided to listen to recordings of telephone calls Harper made from the jail. The detective determined Harper made a call to D.J., the same person he called from the cell phone the day before. Harper told D.J. to go to Jerome Wilson's apartment and look underneath the couch, inside of a CD case, for some "bread" – a common slang term for money. *Id*. at 478. Harper also indicated during the call that he wanted D.J. to retrieve from the apartment "something [in] the bathroom where you put your feet." *Id*.

---

[6] The videogame case and the U.S. currency were not taken from the burgled apartment.

[18] Based on this information, two police detectives returned to Wilson's apartment and, again, obtained permission from Wilson to search the apartment.[7] When Wilson and the detectives approached the door to his apartment, they noticed the lock was broken, the doorplate had "pry marks" on it, and a crowbar was near the door. *Id*. at 479. It did not appear that anyone had gained entry into the apartment. The detectives searched Wilson's apartment and eventually found an H & R model .22 caliber revolver in the bathroom, in a cabinet underneath the sink. The detectives also found a live round of ammunition. The revolver contained five rounds of .22 caliber ammunition and four spent bullet casings.

[19] The State charged Harper with two counts of Class A felony burglary resulting in bodily injury. At the conclusion of the trial, the jury found Harper guilty as charged. The trial court merged the two convictions and sentenced Harper to a total sentence of fifty years executed. Harper now appeals.

# Discussion and Decision

[20] Harper argues there was insufficient evidence to support his conviction for Class A felony burglary. In order to convict Harper of Class A felony burglary, the State was required to prove Harper broke into and entered Peter Fernandes' apartment with intent to commit theft, and that the burglary resulted in bodily

---

[7] Wilson did not stay in his apartment the night following the incident. He returned to the apartment the following day and encountered the police detectives upon his arrival.

injury to another person. According to Harper, the State failed to present evidence sufficiently linking him to the crime. Harper specifically argues the State failed to present evidence he was inside the burgled apartment; and, the State failed to present evidence he was in possession of any stolen property taken from the residence. In support of his claims, Harper argues the eyewitnesses to the crime had a close view of the shooter, yet did not identify Harper as the perpetrator.

[21] Our standard of review for sufficiency of the evidence is well settled. We neither reweigh the evidence nor judge the credibility of witnesses. *Whitlow v. State*, 901 N.E.2d 659, 660 (Ind. Ct. App. 2007). Rather, we consider the evidence most favorable to the verdict and draw all reasonable inferences that support the ruling below. *Id.* at 660-661. We affirm the conviction if there is probative evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Id.* at 661. It is not necessary that the evidence "'overcome every reasonable hypothesis of innocence.'" *Drane v. State*, 867 N.E.2d 144, 147 (Ind. 2007) (quoting *Moore v. State*, 652 N.E.2d 53, 55 (Ind. 1995)).

[22] A conviction may be sustained based on circumstantial evidence. *Baltimore v. State*, 878 N.E.2d 253, 258 (Ind. Ct. App. 2007), *trans. denied*. Circumstantial evidence need not exclude every reasonable hypothesis of innocence; rather, circumstantial evidence can sustain a conviction if an inference may reasonably be drawn from the evidence to support the judgment. *Id.* A burglary or theft

conviction may be sustained by circumstantial evidence alone. *Hill v. State*, 531 N.E.2d 1382, 1383 (Ind. 1989).

[23] In support of his argument, Harper directs our attention to *Janigon v. State*, 429 N.E.2d 959 (Ind. 1982), and *Cantrell v. State*, 673 N.E.2d 816 (Ind. Ct. App. 1996), *trans. denied*. In *Janigon*, our Supreme Court reversed a defendant's conviction as a participant in a robbery where the evidence most favorable to the State consisted of: (1) one witness' testimony that the defendant was seen in the drug store before it was robbed; (2) the testimony of a police officer that the defendant was seen afterwards walking in a nearby neighborhood; and (3) a search of the defendant revealed that he had in his possession bills of the same denominations as those taken from the drug store. Our supreme court found this evidence insufficient to support a finding of guilt beyond a reasonable doubt, stating that "[m]ere presence at the scene of a crime is of itself not sufficient to sustain a conviction for participation." *Janigon*, 429 N.E.2d at 960. Of particular importance to the court was the fact that "only one of the State's witnesses could testify to defendant's presence at the scene," and none of the witnesses was able to identify appellant as the robber. *See Id*.

[24] In *Cantrell*, this court reversed the defendant's conviction for burglary based upon insufficient evidence. There, the defendant parked his car in the driveway of a residence, alleging car trouble. A police officer investigated and Cantrell provided the officer a false name. Shortly after the encounter with the officer, Cantrell drove away. Approximately five hours later, the homeowners returned to their home to find the home had been burgled. This court concluded that

though there was evidence that Cantrell's presence at the residence was "suspicious" and there was evidence to imply Cantrell was "'up to no good,'" there was "no evidence, circumstantial or otherwise, which connect[ed] Cantrell with the break-in of the house. There [was] nothing which indicate[d] that he was inside the residence." *Cantrell*, 673 N.E.2d at 820.

[25] Harper maintains "[t]here was far less evidence presented against [him at trial] than the evidence presented in *Cantrell* and *Janigon*." Appellant's Br. p. 10. We disagree.

[26] Arnaldo testified that when he left the Franklin Street apartment on the morning of the incident, the laptop computer was not laying outside of the door to the apartment. Arnaldo further testified the door was intact when he and Peter left the apartment.

[27] A police detective testified at trial as follows regarding the footprints found in the snow near the burgled apartment: "You could clearly see running footprints in the snow. They were running away from [the burgled apartment]." Tr. p. 251. The detective further testified the footprints were made by some type of tennis or athletic shoe and that the footprints were relatively easy to follow. The evidence technician testified that the footprint found on the door of the burgled apartment could not have been an old footprint because the powder used to lift the print "won't adhere to a – a footwear impression unless it's still slightly damp." *Id.* at 215.

[28]     Police officers tracked the footprints to the Oakland Avenue house and arrived at the house approximately thirty to forty minutes after first responding to the burglary/shooting incident. Upon arrival, the officers learned that an individual might be inside the upstairs apartment. Harper eventually emerged from the apartment. Jerome Wilson, the renter of the apartment, testified at trial that no one was supposed to be in the apartment.

[29]     When officers searched the apartment from which Harper emerged, they found a pair of sweatpants and a pair of athletic shoes that were both wet. The forensic analyst with the Indiana State Police Department testified, unequivocally, as follows regarding the match between the tread of the athletic shoes found in the apartment and the footprint left on the door of the apartment that was burgled:

> There was no error. I came to the conclusion based on the class and individual characteristics. There was a sufficient amount of individual amount [sic] characteristics that I felt that it was beyond any doubt that [the footprint found on the door] was not made by any other shoes, that it could have been made by this particular shoe, because it's also the size and shape of the impression that matched with the shoe as well. . . . Beyond any doubt that I had. . . . If I have any doubt, I will not make an ID, or an identification, or an exclusion.

[30]     *Id.* at 459. Pictures from Harper's Facebook page were introduced into evidence. The pictures showed Harper wearing athletic shoes that were similar to the shoes found in Jerome Wilson's apartment – the apartment from which Harper emerged.

[31]     A bullet was recovered from Gurcharn's knee and from the siding of the Franklin Street house.  Although both bullets were too mangled to determine whether they were fired from the revolver found in Jerome Wilson's bathroom, a firearms expert determined the bullet could have been fired from a .22 caliber handgun.

[32]     Harper made a call from jail to his cousin and told him to go to Jerome Wilson's apartment and retrieve an item from the apartment's bathroom.[8]  This information led detectives to re-search Wilson's apartment and discover a .22 caliber revolver.  The revolver held nine bullets.  Four bullets had been discharged and five bullets remained in their chambers.  One of the victims of the shooting provided an accurate description of Harper and testified that the individual who shot him fired the weapon three or four times.

[33]     During an interview with a police detective that occurred while Harper was awaiting trial, Harper indicated that he "did [not] know anything about any guns or weapons [that might be located] in the [Oakland Avenue] apartment." *Id.* at 516.  However, in one of the telephone calls Harper made from the Elkhart County Jail, he discussed the revolver found in the apartment and stated that "he was loading one of them up and . . . that he was ready to go to war, [sic] battle with the police if they tried to come into the apartment." *Id.* at 521.

---

[8] All of Harper's telephone calls from the jail were recorded by the police.

[34] A police detective testified at trial that she interviewed Harper regarding the burglary of the upstairs apartment at the Franklin Street house. Harper told the detective he had been at the apartment on Oakland Avenue all day and had not left the apartment. Harper's statement to the detective was contrary to other information the detective had received. The detective learned from the occupant of the downstairs Oakland Avenue apartment that Harper had come to her apartment that day to use her cell phone at 12:38 p.m.

[35] Harper's claim is, essentially, that the State failed to present sufficient evidence he was the perpetrator of the crimes. He implies someone else committed the crimes. He presents additional arguments that the athletic shoes found were a different size from what he wears;[9] the wet clothing found was not the same color clothing identified by the victims; and, there was no connection established between the U.S. currency found at the Oakland Avenue apartment and the burglary at the Franklin Street apartment. Harper's claims in this regard are really a request that we reweigh the evidence, which we may not do. *See McHenry v. State*, 820 N.E.2d 124, 126 (Ind. 2005). Sufficient evidence was presented to establish Harper as the perpetrator of the crime and to support Harper's conviction for burglary resulting in bodily injury.

---

[9] The athletic shoes found at the Oakland Avenue apartment were a size 7½. Evidence was presented that Harper wears a size 9 shoe. However, this evidence was derived from a claim made by Harper.

# Conclusion

[36] For the reasons stated above, the judgment of the trial court is affirmed.

[37] Affirmed.


Mathias, J., and Barnes, J., concur.