## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 27 2017, 8:22 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Cara Schaefer Wieneke
Brooklyn, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Earl L. Taylor,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

July 27, 2017

Court of Appeals Case No.
84A01-1607-CR-1684

Appeal from the Vigo Superior Court

The Honorable John T. Roach, Judge

Trial Court Cause No.
84D01-1407-MR-1742

**Altice, Judge.**

## Case Summary

[1] Earl L. Taylor (Taylor) appeals following his conviction for first degree murder. He raises the following issues on appeal:

> 1. Did the State present sufficient evidence to support Taylor's conviction?

> 2. Did the trial court abuse its discretion in denying Taylor's motion to correct error based on alleged juror misconduct?

[2] We affirm.

## Facts & Procedural History

[3] Earl and Kathy Taylor were married in October 1973. Up until the day of the wedding rehearsal, Taylor was also dating eighteen-year-old Cynthia Harshbarger. Two weeks after the wedding, Taylor and Harshbarger met for lunch. Taylor told Harshbarger that it was Kathy's wedding, not his. He stated further that he had life insurance on Kathy and that "people do have accidents." *Transcript Vol. 5* at 117. He also said that he would take out more life insurance and that he and Harshbarger "would have nothing to worry about." *Id.* at 122. Following this meeting, Harshbarger sent Kathy a letter to warn her about what Taylor had said.

[4] In November 1974, Taylor filled out an application for a life insurance policy with Kathy as the insured and himself as the beneficiary. Kathy did not accompany Taylor to the insurance agency, and Taylor told the owners that Kathy was too ill to do so. The application bears what purports to be Kathy's signature in what was later determined to be Taylor's handwriting.

[5]     Over the course of the marriage, Kathy told a number of people that she and Taylor were planning to divorce. On March 30, 1975, Kathy visited her family in Vincennes for Easter. Before leaving to return to the home she shared with Taylor in Terre Haute, Kathy told her sister that she was leaving Taylor and would be returning to Vincennes for good the following Wednesday.

[6]     On Wednesday, April 2, 1975, Taylor left home at approximately 7:00 a.m. A neighbor saw him return home at around 10:00 a.m. and then leave again with Kathy's dog. Throughout the day, Taylor made stops at a number of businesses, including the insurance office of his former coworker, Frederick Davis. Taylor and Davis were not friends and Taylor had never been to Davis's office before. Nevertheless, Taylor stayed at the office for forty-five minutes to an hour, making strained, superficial conversation while continually checking his watch.

[7]     Taylor returned home in the afternoon, at which time he reported discovering Kathy's deceased body. Taylor called his father before calling the police, and Taylor's father arrived at the house before the first responding officer. Taylor told Lieutenant Steve Barnhart of the Vigo County Sheriff's Department that when he left home that morning, Kathy was still in bed. Taylor gave an extremely detailed account of his day, except that he did not account for his whereabouts between 10:00 a.m. and noon. He also failed to mention returning home at 10:00 a.m. and leaving with Kathy's dog. Taylor said that he got home at 4:30 and found Kathy's body in the bathtub with water up to her lower lip and a clock radio submerged in the water. Taylor claimed that he

unplugged the clock radio and placed it on the counter before pulling Kathy's body out of the tub, laying it on the floor, and covering it with a blanket. Taylor also told Lt. Barnhart that Kathy had terminal cancer. Lt. Barnhart observed that Taylor's demeanor was calm and that his clothes were not wet.

[8] Sheriff's Deputy Thomas Roberts looked around the house and saw no signs of a break-in or a struggle. In the bathroom, he saw that there was no water in the bath tub and that a soap dish that had been placed on the edge of the tub near the open shower door was undisturbed. Deputy Roberts saw that the clock radio read 7:43, and he plugged it in and watched as the time switched over to 7:44, indicating that the clock was still operational. Deputy Roberts noted that the clock radio had an unusually long cord, which allowed it to reach into the bathtub from the nearest outlet. A subsequent comparison of the clock radio recovered from the bathroom and another clock radio of the same model purchased by Deputy Roberts shortly after Kathy's death revealed that the cord on the clock radio found in the bathroom had been replaced. The cord was white and over nine feet long, while the cord on the clock radio purchased by Deputy Roberts was a dark color and less than six feet long. The cord on the clock radio Deputy Roberts purchased was too short to reach into the bathtub while plugged into the nearest outlet.

[9] The investigation went cold, but was reopened in 2014. On July 1, 2014, the State charged Taylor with first degree murder. At Taylor's trial, Dr. Clifford Grigg, a professor of electrical engineering at Rose Hulman Institute of Technology, testified concerning an experiment he performed with the clock

radio recovered from the bathroom on the day Kathy's death was reported. Dr. Grigg connected the clock to an electrical supply and immersed it in water while measuring the voltage being applied, the current drawn by the clock while immersed, and the resulting voltage in the water. Dr. Grigg confirmed that 120 volts were being run through the clock radio, which is a standard household electrical supply, and determined that the resulting voltages in the water were too low to cause death or injury.

[10]     Additionally, forensic pathologist Dr. Roland Kohr reviewed the evidence, including police photographs of Kathy's body and the autopsy report from 1975, and testified that based on the degree of pulmonary edema, it was very unlikely that Kathy had died from electrocution. Rather, Dr. Kohr opined that drowning was the most likely cause of death. Dr. Kohr also opined that the physical evidence was inconsistent with Taylor's account of finding Kathy's body in the bathtub at 4:30 p.m. Specifically, Kathy's body lying flat on the floor was not consistent with the body undergoing rigor mortis while in a seated position and that there was no discoloration to the body consistent with being partially submerged for several hours. Rather, Dr. Kohr testified that the evidence indicated that Kathy's body had been on the floor for many hours. Dr. Kohr testified further that rigor mortis would have made it very difficult to maneuver Kathy's body around the sliding glass shower door, and that there were no abrasions on Kathy's body consistent with being dragged over the metal shower door tracks. Dr. Kohr noted that there were bruises on Kathy's arms and chin consistent with being held face down in a tub. Dr. Kohr also

stated that advanced cancer would be quite obvious at a routine autopsy, and no such findings were noted in the autopsy report.

[11] At the conclusion of the trial, the jury found Taylor guilty of first degree murder. On March 23, 2016, Taylor was sentenced to the Department of Correction for the term of his natural life, in accordance with the law in effect at the time of the murder. On April 15, 2016, Taylor filed a motion to correct error alleging juror misconduct. Specifically, Taylor alleged that the jury had been tainted with extrajudicial information relating to Taylor's previous conviction for the murder of his second wife. The trial court denied Taylor's motion to correct error on June 21, 2016, and this appeal ensued. Additional facts will be provided as necessary.

## Discussion & Decision

### 1. Sufficiency of the Evidence

[12] Taylor first argues that the State presented insufficient evidence to support his conviction. In reviewing a challenge to the sufficiency of the evidence, we neither reweigh the evidence nor judge the credibility of witnesses. *McHenry v. State*, 820 N.E.2d 124, 126 (Ind. 2005). Considering only the evidence and the reasonable inferences supporting the verdict, our task is to determine whether there is substantial evidence of probative value from which a reasonable jury could find the defendant guilty beyond a reasonable doubt. *Moore v. State*, 652 N.E.2d 53, 55 (Ind. 1995). Moreover, a conviction may be based purely on circumstantial evidence. *Id.*

> We will not disturb a verdict if the jury could reasonably infer that the defendant is guilty beyond a reasonable doubt from the circumstantial evidence presented. On appeal, the circumstantial evidence need not overcome every reasonable hypothesis of innocence. It is enough if an inference reasonably tending to support the verdict can be drawn from the circumstantial evidence.

*Id.* (citations omitted).

[13] Taylor's arguments on appeal essentially boil down to claims that the State did not establish Kathy's cause of death to a reasonable degree of medical certainty, that Dr. Grigg's experiment was flawed, and that the State did not establish motive because it presented no evidence that Taylor had actually obtained an insurance policy on Kathy or sought to collect on any such policy. We note, however, that the State was not required to prove motive in order to support Taylor's murder conviction. *See Sallee v. State*, 51 N.E.3d 130, 134 (Ind. 2016) ("The State is not required to prove motive."). Furthermore, Taylor's arguments are nothing more than invitations to reweigh the evidence, which we must decline.

[14] As set forth above, the physical evidence was not consistent with the account Taylor gave of finding Kathy's body in the bath tub. Additionally, Kathy's sister testified that it had been Kathy's habit since childhood to take baths at night rather than in the morning. Kathy's sister testified further that there had been a stereo system in Kathy's master bedroom that could be heard throughout the whole house and that Kathy had not kept any electronics in the bathroom.

In addition to Dr. Kohr's testimony that it was very unlikely that Kathy had died from electrocution, there was evidence that the scene of Kathy's death had been staged to appear as if she had. Furthermore, although Dr. Kohr could not conclusively state that Kathy had died as a result of drowning, he was able to state that drowning was more likely than not the cause of her death. There were no signs of a break-in or struggle at the home, and there was testimony that there were serious marital problems. Indeed, Kathy had told her sister that she was going to leave Taylor for good on April 2, 1975—the day her death was reported. Although it is unclear whether Taylor had been successful in his attempt to obtain a life insurance policy on Kathy, Taylor's statements to Harshbarger combined with his apparent forgery of Kathy's signature on a life insurance application suggest that he had been planning Kathy's death for some time. It is also noteworthy that Taylor was able to give an extremely detailed account of his entire day, except for the period between 10 a.m. and noon, during which a neighbor saw him return to the house and then depart with Kathy's dog. When taken together, the evidence supports a reasonable inference that Taylor killed Kathy, whether by drowning or some other means. The State presented sufficient evidence to support Taylor's murder conviction.

## 2. Juror Misconduct

Taylor also argues that the trial court abused its discretion in denying his motion to correct error based on alleged juror misconduct. Specifically, he argues that the jury was tainted as a result of extra-judicial communication between a juror and an unauthorized person. We review a trial court's decision

on whether a defendant is entitled to a new trial due to juror misconduct for an abuse of discretion, keeping in mind that the trial court sits as the initial factfinder on the issues raised. *Wilkinson v. State*, 70 N.E.3d 392, 406 (Ind. Ct. App. 2017). A trial court abuses its discretion when its ruling is clearly against the logic, facts, and circumstances presented. *Palilonis v. State*, 970 N.E.2d 713, 723 (Ind. Ct. App. 2012), *trans. denied*. On appeal, we will not reweigh the evidence, and we will consider conflicting evidence most favorable to the trial court's ruling. *Id.* "Because the trial court evaluates first-hand the relevant facts and circumstances at issue and their impact on the jury, it is in the best position to evaluate whether a mistrial is warranted." *Weisheit v. State*, 26 N.E.3d 3, 15 (Ind. 2015), *cert. denied*.

[16] A defendant seeking a mistrial due to suspected jury taint resulting from improper extra-judicial communications is entitled to a presumption of prejudice after making two showings by a preponderance of the evidence: "(1) extra-judicial contact or communications between jurors and unauthorized persons occurred, and (2) the contact or communications pertained to the matter before the jury." *Id.* (quoting *Ramirez v. State*, 7 N.E.3d 933, 939 (Ind. 2014)). If the defendant makes both showings, the burden shifts to the State to rebut the presumption of prejudice by showing that the communications were harmless. *Id.* If the State fails to do so, the trial court must grant a new trial. *Id.*

[17] Taylor's motion to correct error was based on a claim that the jury had been tainted with extrajudicial information relating to Taylor's previous conviction

for the murder of his second wife. In support, Taylor noted that the court notified the parties that bailiff Kimberly Rohrbach had reported communicating with the jury foreperson following the trial. According to Rohrbach, the foreperson told her that another juror, Juror #4, had knowledge of Taylor's prior conviction, and that Juror #4 had shared this knowledge with the foreperson.

[18] In an affidavit attached to Taylor's motion to correct error, the jury foreperson stated that after the verdict was read and all jurors had returned to the jury room, Juror #4 said that a family member had previously "[t]ried to tell her something" but "[s]he never stated what it was or said it to any members in my presence." *Appellant's Appendix Vol. 3* at 173. In a recorded interview, Juror #4 indicated that she had spoken to her mother the evening before the last day of the trial. Juror #4 stated that she had told her mother that she was a juror on a murder case and that she could not discuss the matter. Juror #4's mother said "I don't know why they let him out in the first place." *Id.* at 183. Juror #4 reminded her mother that she could not talk about the case and the conversation went no further. Juror #4 stated that she did not inform the court of the conversation because she "didn't know who [her mother] was talking about. I mean in my mind, I didn't know if we were even talking about the same person. She didn't know who I was on trial with. And so it could have been about anybody." *Id.* at 186. Juror #4 explained further that after the verdict was pronounced and the jury was discharged, the trial judge spoke to the jury and informed them that Taylor had been convicted of murdering his

second wife and released from prison prior to being arrested for Kathy's murder. It was at that point that Juror #4 understood what her mother had been referring to, and she said "that's what my mom was talking about." *Id.* at 184-85. Juror #4 stated that her mother's statement had no impact on her during deliberations and that she did not even think about it again until the judge spoke to the jury after the trial.

[19] In its order denying Taylor's motion to correct error, the trial court found that there was "no evidence that any juror had any information about defendant's prior murder conviction prior to reaching their verdict and being discharged." *Id.* at 235. The court further found that there was no evidence of juror misconduct, nor any indication that juror neutrality was compromised or that the jury was exposed to extraneous prejudicial information about Taylor. We agree. Whatever Juror #4's mother intended to communicate, Juror #4 made it clear that she did not understand the statement to even refer to Taylor, and she certainly did not understand the statement to indicate that Taylor had murdered his second wife or committed any other crimes. Further, Juror #4 clearly stated that her mother's statement had no effect on her whatsoever during deliberations, and she did not communicate what her mother had said to any other jury member until after the verdict was pronounced and the jury was discharged. Thus, even if we assume that Taylor presented sufficient evidence to trigger the presumption of prejudice, the State presented ample evidence to rebut that presumption by showing that the extra-judicial communications at issue here were harmless.

Judgment affirmed.

Kirsch, J. and Mathias, J., concur.